**BRAE ASSET FUND, L.P.**

v.

**Robert L. ADAM.**

Supreme Judicial Court of Maine.

Submitted on briefs June 8, 1995.

Decided July 19, 1995.

Edward J. Kelleher, Melissa A. Hewey, Drummond, Woodsum & MacMahon, Portland, for plaintiff.

Ricky L. Brunette, Szwed & Brunette, Portland, for defendant.

Before WATHEN, C.J., and ROBERTS, GLASSMAN, CLIFFORD, DANA, and LIPEZ, JJ.

GLASSMAN, Justice.

Robert L. Adam appeals from the judgment entered in the Superior Court (Cumberland County, *Wernick, A.R.J.*) following a jury verdict in favor of Brae Asset Fund (the Bank)[1] on its complaint against Adam seeking enforcement of a $140,000 personal guaranty signed by Adam. Adam does not challenge the sufficiency of the evidence to support the jury verdict. Rather, he contends that because the trial court erred in its instructions to the jury, he is entitled to a new trial. We affirm the judgment.

The record reveals that the following evidence was submitted to the jury: In 1986, Adam was approached with an investment opportunity in ALCO Packing Co., Inc., a meat packing company. Adam was a retired accountant and had no experience in the meat packing industry. ALCO's president gave Adam three years of financial statements from 1984 to 1986 and Adam obtained working papers from ALCO's accountant. In late 1986, Adam had two meetings with the Bank that provided the term financing of ALCO's real property and a revolving line of credit for ALCO's working capital needs. The Bank advised Adam that it would lend 80% of the amount of ALCO's current accounts receivable, no older than 30 days, up to $500,000. Further, the Bank advised Adam that if he invested in ALCO, the Bank would continue to provide the revolving line of credit and would hold a first security interest in the current and non-current accounts receivable, the meat inventory and the equipment.

On March 17, 1987, Adam invested in the company by purchasing ALCO's real estate and $25,000 of ALCO's common stock in exchange for a 40% interest in the company. Adam also became a director of ALCO. Two weeks later, the Bank told ALCO that it

---

1. The original bank in this case was Patriot Bank that later merged with the Bank of New England. When the Bank of New England was declared insolvent, the FDIC was appointed the receiver of the bank's assets. The FDIC sold the claims at issue in this case to Brae Asset Fund. By order of this Court, on August 14, 1994, Brae Asset Fund was substituted for the FDIC as the plaintiff. For ease of reference, the banks and Brae Asset Fund will be referred to collectively as "the Bank."

wished to withdraw from its financing relationship with ALCO. After repeated discussions between Adam and the Bank during 1987, the Bank notified Adam that it would reduce ALCO's line of credit unless Adam signed a personal guaranty in the amount of $140,000. Adam analyzed ALCO's current collateral and based on his understanding that the Bank had a first security interest and only loaned up to 80% of the current accounts receivable, Adam concluded that he would not be at risk if he signed the guaranty.

In January 1988, Adam signed a personal guaranty for $140,000.[2] The guaranty provided that "the liability of [Adam] hereunder is direct and unconditional and may be enforced without requiring [the Bank] first to resort to any other right, remedy or security." The Bank terminated its lending relationship with ALCO in late January and demanded that ALCO pay the amount loaned to it on its revolving credit line. When ALCO's attempts to secure another lender were fruitless, it closed the company on April 1, 1988. ALCO processed and sold the remaining meat at its plant. Adam knew that by closing the plant ALCO's checks issued to cattle sellers during the last week of operations would be returned for insufficient funds. Adam believed that because the cattle sellers were unsecured creditors, the Bank's loan would take priority over the cattle sellers' claims and the loan would be paid in full with ALCO's assets.

Shortly after the plant was closed, the Stockyards and Packers Administration of the United States Department of Agriculture notified Adam that the Stockyards and Packers Act, 7 U.S.C. § 196 (1992),[3] provides that the unpaid cattlemen had a first priority claim on ALCO's inventory and receivables. The Act provides in pertinent part:

All livestock purchased by a packer in cash sales, and all inventories of, or receivables or proceeds from meat, meat food products, or livestock products derived therefrom, shall be held by such packer in trust for the benefit of all unpaid cash sellers of such livestock until full payment has been received by such unpaid sellers.... Payment shall not be considered to have been made if the seller received a payment instrument which is dishonored: Provided, That the unpaid seller shall lose the benefit of such trust if, in the event that a payment instrument has not been received, within thirty days of the final date for making a payment under Section 409, or within fifteen business days after the seller has received notice that the payment instrument promptly presented for payment has been dishonored, the seller has not preserved his trust under this subsection. The trust shall be preserved by giving written notice to the packer and by filing such notice with the Secretary.

7 U.S.C. § 196(b) (1992). In a letter to Adam dated April 6, 1988, the regional supervisor of the Administration explained:

The trust arises by operation of law at the point when payment to the livestock seller is due, that is, by the close of the next business day after the initial sale of livestock. The packer serves as the fiduciary of the trust. It is your obligation as a fiduciary to account for and preserve all trust assets until all cash livestock sellers have been paid in full. In order to preserve the trust assets, we recommend that you establish a separate interest bearing trust account, specifically designated as a "Trust Account for Unpaid Cash Sellers of Livestock Pursuant to Section 206 of the Packers and Stockyards Act." All proceeds collected by you must be held in trust for the benefit of unpaid cash seller and should be promptly deposited to this account. Any misuse or dissipation of the trust assets will be considered an unfair practice in violation of the Packers and Stockyards Act for which we may seek injunctive or other appropriate relief.

The parties stipulated, *inter alia*, that the Bank was aware of the Act when it entered

---

**2.** Although there was evidence that Adam was represented by different attorneys for various aspects of the transactions with ALCO and the Bank, there was also evidence that Adam signed the guaranty without consulting an attorney.

**3.** By P.L. 94–410, § 8, 90 Stat. 1251, section 196 was enacted, effective September 13, 1976.

into the financing agreement with ALCO in 1983, and although not specifically referred to, the Act had been the basis of a side agreement between the parties that ALCO would pay its livestock sellers within 1 day of delivery. No livestock seller had asserted a claim prior to the closing of ALCO's business. The claims of the livestock sellers totaled approximately $240,000. After ALCO made payment of this amount to the trust fund, there was insufficient collateral to pay the amount owed to the Bank. In response to the Bank's demand, Adam refused to honor his personal guaranty, and the Bank filed the present action.

By his answer and counterclaim, Adam asserted that the Bank had negligently misrepresented that it held a first security interest in ALCO's assets and that had he known of the existence of the Packers and Stockyards Act, he would not have executed the guaranty. From the judgment entered on the jury verdict in favor of the Bank, Adam appeals.

■ When, as here, the plaintiff has made a timely objection, pursuant to M.R.Civ.P. 51(b), to the trial court's instructions to the jury, an error in the instructions is reversible error only if it results in prejudice. *Davis v. Severance*, 657 A.2d 1153, 1154 (Me.1995).

■ Adam first contends that the trial court erroneously instructed the jury that because nothing in the case suggested a confidential relationship between Adam and the Bank, the Bank had no duty of disclosure to Adam concerning the Act. The law is well established that absent a fiduciary or confidential relationship, there is no duty to disclose information. *MacMath v. Maine Adoption Placement Services*, 635 A.2d 359, 361 (Me.1993). We have previously stated that "the salient elements of a confidential relation are the actual placing of trust or confidence in fact by one party in another and a great disparity of position and influence between the parties to the relation." *Diversified Foods, Inc. v. First Nat'l Bank of Boston*, 605 A.2d 609, 614 (Me.1992) (citing *Ruebsamen v. Maddocks*, 340 A.2d 31, 35 (Me.1975)). Here, as in *First NH Banks Granite State v. Scarborough*, Adam has

failed to establish the existence of a confidential relationship with the Bank:

> Defendant, however, has shown only that a creditor-debtor relationship existed between the Bank and himself. Nothing suggests that a greater relationship existed. He did not have a long-term relationship of trust with the Bank, and the scope of their relationship was limited to the loans.... We have not held that a creditor-debtor relationship by itself creates a fiduciary duty or other duty of disclosure.

615 A.2d 248, 250 (Me.1992). Accordingly, the Bank had no duty to disclose the existence of the Act, and the trial court appropriately instructed the jury on this issue.

■ Adam next contends that the trial court erroneously instructed the jury on the elements of negligent misrepresentation. In defining the elements of negligent misrepresentation, we have previously determined that:

> One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary losses caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating information.

*Chapman v. Rideout*, 568 A.2d 829, 830 (Me. 1990) (citing RESTATEMENT (SECOND) OF TORTS § 552(1) (1977)). Contrary to Adam's contentions, the record demonstrates that the trial court properly instructed the jury as to these elements.

■ Finally, we reject Adam's contention that the trial court erroneously instructed the jury that at the time the Bank represented to Adam that it had a first security interest in ALCO's assets, no other party had an outstanding interest. When the Bank made its representation, it had no reason to believe that any livestock sellers had not been paid or that any livestock sellers would have pending claims pursuant to the Act. Indeed, there is no evidence that before ALCO closed in 1988 any livestock seller had ever made a claim pursuant to the Act or had not been timely paid. Based on this record, the trial

court's instruction regarding the effect of the Act is not reversible error.

The entry is:

Judgment affirmed.

All concurring.