In re **FORD MOTOR COMPANY VEHICLE PAINT LITIGATION.**

**CIV.A. No. MDL 1063.**

United States District Court, E.D. Louisiana.

Aug. 25, 1998.

Gene W. Lafitte, Sr., George Denegre, Jr., Michael D. Rubenstein, Liskow & Lewis, Frank J. Peragine, Thomas John Fischer, Judy Perry Martinez, Simon, Peragine, Smith & Redfearn, L.L.P., Lawrence Emerson Abbott, Terrence Kent Knister, Monique M. Weiner, Abbott, Simses, Album & Knister, Stephen Barnett Murray, Murray Law Firm, New Orleans, LA, H. Philip Radecker, Jr., Album, Stovall, Radecker & Giordano, Metairie, LA, Colvin Gamble Norwood, Jr., McGlinchey Stafford, P.L.L.C., New Orleans, LA, for Ford Motor Co. Vehicle Paint Litigation.

Patricia D. Howard, Clerk, MDL Judicial Panel, Washington, DC, Movant.

### *ORDER AND REASONS DENYING PLAINTIFFS' MOTION FOR CLASS CERTIFICATION*

VANCE, District Judge.

Before the Court is plaintiffs' Motion for Class Certification pursuant to Rule 23(c)(1) of the Federal Rules of Civil Procedure. The parties extensively briefed this motion,

and the Court heard oral argument in this matter on April 14, 1998. Following the argument, the Court requested that plaintiffs submit a trial plan and a proposed set of jury charges. Plaintiffs have done so, and defendant has responded to these pleadings. Based on the Court's review of all of the foregoing materials and the applicable law, plaintiffs' motion is DENIED.

## I. FACTUAL BACKGROUND

This proposed class action seeks damages against Ford for fraudulently concealing a paint defect in certain of the vehicles it manufactured. Plaintiffs submit that the application of exterior body paint to automobiles typically involves a three-step process: (1) the application of electrocoat to the sheet metal; (2) the application of a spray primer; and (3) the application of an enamel electrocoat. It is alleged that in the 1980's, Ford Motor Company began applying a "high build electrocoat," also known as HBEC or UNIPRIME. With the introduction of HBEC, Ford eliminated the intermediate spray primer, the second step in the paint process. Plaintiffs assert that the absence of spray primer from Ford's vehicles is a "defect" that causes the paint on the automobile to peel prematurely and to flake.

Plaintiffs contend that Ford was aware of the tendency of the two-step paint process to fail as early as 1986. It is alleged that from 1986 to 1990, Ford received reports of paint peeling on vehicles that were painted with the two-step process. Plaintiffs claim that Ford's own investigations determined that ultraviolet light was penetrating the enamel color coat and the high build electrocoat causing the color coat to separate from the electrocoat. The result was peeling paint, which plaintiffs claim was produced by the absence of the intermediate spray primer. Plaintiffs' Mem. at 4. Plaintiffs also suggest that despite Ford's knowledge, it neither reinstated the three-step application nor modified its production facilities to address the problem within the time period involved in this case. Instead, Ford allegedly used

"quick fixes" to ameliorate the problem and did not change its paint production processes to restore an intermediate spray primer until the early 1990's.

Plaintiffs also claim that Ford embarked on a scheme or plan to conceal the defect. They assert that Ford concealed information from the consuming public, the Federal Trade Commission, and various states' attorneys general. Plaintiffs accuse Ford of issuing "secret warranties" on certain trucks and selectively repairing "legitimate" problems. Further, plaintiffs charge that Ford's notification program to owners, the Owner Dialogue Program, was intentionally ineffective and under-inclusive.

Relying on Rule 23(b)(3) of the Federal Rules of Civil Procedure, plaintiffs propose to certify the following class:

> All persons domiciled or residing in the 49 states of the United States of America (other than the state of Texas), and the District of Columbia, who purchased new 1990–1993 model year Ford F Series, 1990–1993 model year Ford Bronco, or 1990–1993 model year Ford Ranger vehicles which were painted in whole or in part without spray primer and which experienced peeling or flaking paint after December 30, 1993.

Plaintiffs also propose the following subclass:

> All persons domiciled or residing in the state of Alabama who purchased new 1990–1993 model year Ford F Series, 1990–1993 model year Ford Bronco or 1990–1993 model year Ford Ranger vehicles which were painted in whole or in part without spray primer and which experienced peeling or flaking paint on these vehicles.

Plaintiffs name as class representatives Gil Rosmiller and Gene Myler with respect to the first class and Thomas Arnold as class representative for the Alabama subclass.[1]

Defendant has opposed the class certification motion on the ground that there was no single paint process applied to the three

---

1. Plaintiffs originally named Betty Cefalu as a proposed class representative, but in their reply memorandum they acknowledged that she does

not fall within the class definition because she purchased her vehicle used. Plaintiffs' Reply Mem. at 17, n. 30.

models of trucks and utility vehicles over the four model years in question, so that the issue of product defect is vehicle-specific. Defendant also asserts that other elements of plaintiffs' fraudulent concealment claim and its defenses to those claims require individualized proof. Finally, defendant asserts that variations in the laws of the fifty jurisdictions at issue preclude the formulation of a comprehensible set of jury instructions and that trial of this matter as a class action would be unmanageable and violate its Seventh Amendment right to a jury trial.

## II. LEGAL DISCUSSION

### A. Elements and Standards of Rule 23

Plaintiffs seek to certify a nationwide class based on a mass tort of fraudulent concealment under state law. The Fifth Circuit's decision in *Castano v. American Tobacco Co.*, 84 F.3d 734 (5th Cir.1996), sets the ground rules for this Court's class certification analysis. As such, the Court does not write on a blank slate because *Castano* sets the outer limits of the Court's discretion in class certification matters.

*Castano* teaches that a district court must conduct a rigorous analysis of the Rule 23 prerequisites before certifying a class. *Castano*, 84 F.3d at 740 (*citing General Tel. Co. v. Falcon*, 457 U.S. 147, 161, 102 S.Ct. 2364, 2372, 72 L.Ed.2d 740 (1982)). The discretion to certify a class is broad but it must be exercised within the framework of Rule 23. *Id.* A district court may look past the pleadings to determine whether the requirements of Rule 23 have been met. *Id.* at 744. *Castano* explained that going beyond the pleadings is necessary "as a Court must understand the claims, defenses, relevant facts, and applicable substantive law in order to make a meaningful determination of the certification issues." *Id.*

Federal Rule of Civil Procedure 23(a) sets forth four threshold requirements that must be satisfied before a case is certified as a class action. The rule states:

One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed.R.Civ.P. 23(a). In addition to satisfying each of these four prerequisites, the party seeking class certification must show that the action falls within one of the categories listed in Rule 23(b). In this case, plaintiffs seek to certify the class pursuant to Rule 23(b)(3), which imposes two additional prerequisites, predominance and superiority: "[Q]uestions of law or fact common to the members of the class [must] predominate over any questions affecting only individual members, and ... a class action [must be] superior to the other available methods for the fair and efficient adjudication of the controversy." Fed.R.Civ.P. 23(b)(3). *See Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 117 S.Ct. 2231, 2245–46, 138 L.Ed.2d 689 (1997) (characterizing 23(b)(3) as two additional requirements).

The Supreme Court of the United States has noted that reliance on Rule 23(b)(3) as a basis for class certification "invites a close look at the case before it is accepted as a class action." *Id.* at 2246 (internal quotations omitted). To assist the courts in their "close look," Rule 23(b)(3) includes a "nonexhaustive list" of factors pertinent to the court's findings:

(A) the interest of the members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

Fed.R.Civ.P. 23(b)(3).

The Fifth Circuit in *Castano* ruled that when plaintiffs seek to certify a nationwide class of state law claimants under Rule 23(b)(3), the Court must consider how variations in state law affect the issues of predominance and superiority. 84 F.3d at 740. In

addition, the predominance/superiority inquiry must consider how the case would actually be tried as a class action to determine whether manageability problems prevent class litigation from being the superior mode of adjudication. *Id.* at 740, 743–45.

## B. The Prerequisites of Rule 23(a)
### 1. Numerosity

■ Rule 23(a)(1) simply requires that the class be so large that joinder of all members is impracticable. Although plaintiffs acknowledge that the precise number of class members is currently unknown, Ford does not dispute that the class could number in the tens, if not hundreds, of thousands of members. Pls. Mem. at 12–13. Accordingly, the Court finds that plaintiffs have satisfied the numerosity requirement.

### 2. Commonality

■ The commonality test of Rule 23(a)(2) is met when there is "at least one issue whose resolution will affect all or a significant number of the putative class members." *Stewart v. Winter,* 669 F.2d 328, 335 (5th Cir.1982). Because of this minimal requirement, "[t]he threshold of commonality is not high." *Jenkins v. Raymark Inds., Inc.,* 782 F.2d 468, 472 (5th Cir.1986). In this case, the Court can identify "at least one issue" of law or fact common to the class. For example, Ford's course of conduct with respect to the implementation of the paint processes at issue is in some respects a common factual issue. Plaintiffs have therefore satisfied the commonality requirement. This finding does not, however, resolve the inquiry under Rule 23(b)(3) as to whether common issues predominate over individual ones. *See In re Ford Motor Co. Bronco II Product Liability Litigation* ("Bronco II"), 177 F.R.D. 360, 365–67 (E.D.La. 1997) (conceding commonality but considering issue in more detail under predominance inquiry of 23(b)(3)).

### 3. Typicality and Adequacy of Representation

■ Rule 23(a)(3) requires that "claims or defenses of the representative parties [be] typical of the claims or defenses of the class." The test for typicality is not demanding, *Shipes v. Trinity Inds.,* 987 F.2d 311, 316 (5th Cir.1993), and it focuses on the general similarity of the legal and remedial theories behind their claims. *Jenkins,* 782 F.2d at 472; *see* 1 Herbert B. Newberg & Alba Conte, *Newberg on Class Actions* § 3–13, at 3–76 (3d ed. 1992) ("[A] plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members, and if his or her claims are based on the same legal theory."). One of the purposes of the typicality requirement is to ensure that the representative's interest is "aligned with those of the represented group, and in pursuing his own claims, the named plaintiff will also advance the interests of the class members." *In re American Medical Systems, Inc.,* 75 F.3d 1069, 1082 (6th Cir.1996). *See Bronco II,* 177 F.R.D. at 366–67 (noting that purpose of typicality element is to ensure that interests of absent class members are protected).

■ Rule 23(a) also requires that the representative parties must "fairly and adequately protect the interests of the class." Fed.R.Civ.P. 23(a)(4). This requirement "is essential to due process, because a final judgment in a class action is binding on all class members." *American Medical Systems,* 75 F.3d at 1083 (*citing Hansberry v. Lee,* 311 U.S. 32, 61 S.Ct. 115, 85 L.Ed. 22 (1940)). As with the typicality requirement, this element requires that the interests of the named plaintiffs are aligned with the unnamed class members to ensure that the class representative has an incentive to pursue and protect the claims of the absent class members.[2] *Id.; Amchem Products,* 521 U.S. at —— n. 20, 117 S.Ct. at 2251 n. 20 ("The adequacy-of-representation requirement 'tends to merge' with the commonality and typicality criteria of Rule 23(a), which 'serve as guideposts for determining whether ... maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the

---

**2.** This factor also looks at the qualifications of counsel. There is no dispute that plaintiffs' counsel are competent lawyers with extensive experience with class action litigation.

interests of the class members will be fairly and adequately protected in their absence.'") (*quoting General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147, 157 n. 13, 102 S.Ct. 2364, 2370 n. 13, 72 L.Ed.2d 740 (1982)).

Because the Court finds that the proposed class fails to satisfy the superiority and predominance inquiries of Rule 23(b)(3), it is unnecessary to decide the typicality and adequacy of representation issues.

## C. Rule 23(b)(3)(1) Requirements: Predominance/Superiority

■ As noted above, Rule 23(b)(3) requires that "questions of law or fact common to members of the class predominate over any questions affecting only individual members, and that a class action is superior to the other available methods for the fair and efficient adjudication of the controversy." Fed. R.Civ.P. 23(b)(3). The predominance inquiry is "far more demanding" than Rule 23(a)'s commonality requirement and "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Products,* 521 U.S. at ——, ——, 117 S.Ct. at 2250, 2249.

■ The issues of predominance and superiority cannot be analyzed in a vacuum. In order to put the predominance issue in context and to determine whether a trial of this matter as a class action would be manageable and fair to both sides, the Court asked plaintiffs to outline how this proposed class action would be tried. In response, plaintiffs propose a trial of certain common issues followed by a second phase described as an "administrative claims" procedure. Plaintiffs assert that common issues include the existence of a defect, Ford's knowledge of and failure to disclose the defect, Ford's intent, a species of causation, and the "measure" of compensatory damages. Plaintiffs concede that the classwide proof of causation would not really amount to individual proof of causation and that the issue would have to be revisited as to each plaintiff in the second phase of the proceeding. Plaintiffs also claim that reliance, while an individual issue, may be proved on a classwide basis by "showing the materiality of the undisclosed facts." Then the two class representatives would testify that they did not know of the defective paint process and would not have purchased their vehicles at all or for the same price if they had known of the defect. Plaintiffs claim this evidence would permit an inference of reliance in favor of the hundreds of thousands of putative class members.

Once "liability" is determined in phase one, plaintiffs would issue notice to putative class members to participate in the administrative claims procedure. At this stage, the individual plaintiffs would demonstrate actual reliance by direct testimony, affidavit, "or other administrative procedure." In this administrative process, plaintiffs would establish class membership by affidavit, which would provide information on the vehicle model year and identification, a description of the paint failure, and the date on which the class member first noticed the paint failure. A special master would review and make recommendations on individual claims. Defendant would be able to contest the findings of the special master but "not necessarily with full blown trials." This procedure, plaintiffs contend, is designed to obviate the need for individual trials on causation and damages. Plaintiffs dismiss defendant's arguments regarding the need to individually litigate reliance, causation and damages. Plaintiffs assert that after the liability phase of the class trial, Ford will be "well advised" to agree to a truncated proceeding rather than waste its resources litigating individual claims.

As to the issue of the variation in the laws of the 50 jurisdictions involved, plaintiffs concede that there are state law differences in the burdens of proof, standards of reliance and standards on the existence *vel non* of a duty to disclose, but argue that these differences can be handled by a combination of motion practice and proposed jury charges and jury interrogatories.

Defendant takes issue with most aspects of plaintiffs' trial plan. Defendant contends that determining who is in the class would itself require thousands of minitrials because the issue of when the plaintiff noticed paint peel is plaintiff-specific and not susceptible to an administrative determination. Defendant denies the existence of any issues susceptible

to classwide proof. Ford claims that various paint processes were used on the vehicles in issue, which produced different performance characteristics, and that any number of factors cause paint peel. Ford contends that putative class members vary as to the amount of their exposure to public information on the paint peel issue and that Ford's knowledge of the problem varied over the period covered. Ford also argues that variations in state law preclude comprehensible jury instructions and that the plaintiffs' proposed trial plan violates its Seventh Amendment right to a jury trial.

The Court's review of the class certification record leaves it convinced that common issues do not predominate. First, it is doubtful that the issue of product "defect" is common to all proposed class members. This case does not involve a single failure event or a simple, fungible product. Rather, Ford's challenged course of conduct spanned at least seven years and involved different models of vehicles, made of different materials, painted a variety of colors at different plants, using different paint formulae. Further, Ford's paint processes changed over time. The Court is not convinced that every variation in color and paint process affects failure rates as Ford appears to suggest.[3] In any case, plaintiffs' own expert agrees that one or more of the factors cited by Ford does affect the failure rates that can be expected from the elimination of spray primer. For example, plaintiffs' expert testified that vehicles painted a solid color with proper film thickness and baked appropriately had no increased propensity to peel, even if painted without spray primer. Pls.' Expert Dep. at 229–30. Plaintiffs' expert also testified that whether the defect will manifest itself at all depends on other factors besides whether it was painted with spray primer. Further, he did not dispute that failure rates vary based on how individual drivers used their vehicles and on the environmental factors to which the vehicles were exposed. He also admitted that Ford's addition of ultraviolet light absorbers affects the failure rate by extending the life of the paint job. Plaintiffs assert that these facts do not make any difference

or that to take them into account is an improper analysis of the merits of their claims. But the Court does not see how it can ignore these facts. They suggest that the putative plaintiffs' vehicles are not similarly situated on the defect issue.

Regarding Ford's knowledge and concealment, there is evidence that Ford's state of knowledge was not uniform over the period in issue and that certain of its alleged "concealing" activities occurred in 1992, which could not have affected plaintiffs' purchasing 1990 model-year vehicles. When defendant's conduct means different things for different class members, trying the issue of its liability for that conduct on an aggregated basis is problematic.

There is also no escaping the reality that causation, reliance, damages and affirmative defenses relating to the state of plaintiffs' knowledge, mitigation and the timing and nature of their paint problems require individualized determinations in order to establish that any plaintiff may recover from Ford. Even plaintiffs concede that their proposed Phase I trial of common issues would not establish individual causation, but contend that they could establish something called "general causation." It is not entirely clear to this Court what "general causation" means or what the legal significance is of having proved it. What is clear is that plaintiffs concede that proof of "general causation" would not satisfy each class member's obligation to prove "that their vehicle experienced paint failure which was caused by the absence of spray primer." Trial Plan at 13. Indeed, plaintiffs' expert conceded that peeling paint could be caused by other factors such as foreign matter in the paint or oversanding, even when spray primer is used. He further testified that while he believed that the absence of primer resulted in a propensity for paint peeling, the environmental history to which a vehicle was exposed after it was painted has a greater influence on peel propensity than the elimination of primer. *Id.* at 252.

**3.** Perhaps subclassing could deal with this problem, but plaintiffs do not propose subclasses, and

defendant asserts that they would be so numerous as to be unmanageable.

Under plaintiffs' trial plan, proof of individual causation would be considered in the "administrative claims" phase of the trial. Plaintiffs propose to prove causation by having plaintiffs submit affidavits which would be evaluated by a special master whose findings could be challenged by Ford. This one-sided procedure would amount to an end-run around defendant's right to cross-examine individual plaintiffs. Plaintiffs' own experts found it necessary to do hours of inspection and testing to establish the nature of the paint problem on the class representatives' vehicles. These experts then disagreed with defendant's experts as to the nature and scope of the problem. This disagreement among experts suggests that both the nature of the paint problem and causation would require individualized discovery, retention of experts, and trials for each plaintiff.

As to reliance, the Fifth Circuit has held that "a fraud class action cannot be certified when individual reliance will be an issue." *See Castano v. American Tobacco*, 84 F.3d 734, 745 (5th Cir.1996) *(citing Simon v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 482 F.2d 880 (5th Cir.1973)). Plaintiffs assert that they are entitled to a presumption of reliance because this is a fraudulent concealment case, not one of fraudulent misrepresentation. Plaintiffs contend that reliance may be presumed once the materiality of the omissions is proved and the class representatives testify that they would have acted differently had they known of the defect. However, the record reflects that the paint peel issue attracted increasing media attention over the period covered by this case, to which at least some plaintiffs could have been exposed. If they were aware of potential problems and bought the vehicles anyway, clearly their reliance can be called into question. This factor suggests that reliance is an individualized issue.

Further, this Court's research reveals that the vast majority of states have never adopted a rule allowing reliance to be presumed in common law fraud cases, and some states have expressly rejected such a proposition. *See, e.g., Mirkin v. Wasserman*, 5 Cal.4th 1082, 1093, 23 Cal.Rptr.2d 101, 107, 858 P.2d 568 (Cal.1993) ("We see no reason to adopt the ... presumption [of reliance in fraud cases] as California law."); *Gaffin v. Teledyne, Inc.*, 611 A.2d 467, 474–75 (Del. 1992) (fraud-on-the-market presumption of reliance is not available in state fraud claims); *Stellema v. Vantage Press, Inc.*, 121 Misc.2d 1058, 470 N.Y.S.2d 507, 510–12 (N.Y. Sup. 1983). *But see Cope v. Metropolitan Life Insurance Co.*, 82 Ohio St.3d 426, 696 N.E.2d 1001, 1007–08 (1998) (inference permitted); *State v. First National Bank of Anchorage*, 660 P.2d 406, 422 n. 26 (Alaska 1982) (same). Moreover, the vast majority of federal courts have refused to recognize such a presumption in common law fraud cases when the controlling state has not expressly adopted such a rule. *See, e.g., Antonson v. Robertson*, 141 F.R.D. 501, 508 (D.Kan.1991) (with no state law analogue to fraud-on-the-market theory, plaintiff must prove reliance in common law fraud claim); *Gerstein v. Micron Technology, Inc.*, 1993 WL 735031, *7 (D.Idaho 1993) (same); *Wells v. HBO & Co.*, 813 F.Supp. 1561, 1569 (N.D.Ga.1992) (Georgia courts always require proof of actual reliance and have not adopted a fraud-on-the-market theory that would allow a court to presume reliance); *In re Sahlen & Assoc., Inc. Securities Litigation*, 773 F.Supp. 342, 371 (S.D.Fla.1991) (presumption of reliance unavailable under Florida law); *In re Synergen, Inc. Securities Litigation*, 154 F.R.D. 265, 267 (D.Colo.1994) (Colorado fraud law requires proof of actual reliance as opposed to presumption of reliance available under federal securities laws); *Hoexter v. Simmons*, 140 F.R.D. 416, 424 (D. Ariz. 1991) (no presumption under Arizona fraud law); *In re Ford Motor Co. Ignition Switch Products Liability Litigation*, 174 F.R.D. 332, 346 (D.N.J.1997); *In re Information Resources, Inc. Securities Litigation*, 1994 WL 124890, *3 (N.D.Ill.1994) ("... this court refuses to assume that Illinois courts would apply the fraud-on-the-market presumption of reliance to its common law."); *In re Medimmune, Inc. Securities Litigation*, 873 F.Supp. 953, 968 (D.Md.1995) (holding "there is no reason to suppose Maryland courts" would apply the fraud on the market concept in connection with common law fraud claims); *In re One Bancorp Securities Litigation*, 136 F.R.D. 526, 533 (D.Me.1991); *In re SciMed Securi-*

*ties Litigation,* 1993 WL 616692, *6 (D.Minn. 1993); *Redtail Leasing, Inc. v. Bellezza,* 1997 WL 603496, *6 (S.D.N.Y.1997); *Faktor v. American Biomaterials Corp.,* 1991 WL 336922, *7 (D.N.J.1991); *O'Neil v. Appel,* 165 F.R.D. 479, 504–05 (W.D.Mich.1996) ("The Michigan Supreme Court has never adopted a fraud-on-the-market theory or other presumption that would relieve a plaintiff of the burden of proving individual reliance in this case."); *Staudt v. Artifex, Ltd.;* 16 F.Supp.2d 1023, 1029–30 (E.D.Wis.1998) (refusing to presume reliance under Wisconsin law); *Rosenstein v. CPC International, Inc.,* 1991 WL 1783, *5 (E.D.Pa.1991).

Variations in the states of plaintiffs' knowledge also bears on the issue of concealment. Plaintiffs assert that an element of their fraudulent concealment claim is that "the undisclosed fact was unknown and inaccessible to class members." Pls'. Proposed Jury Charges. If the various plaintiffs are in different positions with respect to their actual or constructive knowledge of potential paint peel problems, a classwide finding on this issue based on two class representatives' testimony would be improper.

Finally, Ford's defenses are likewise plaintiff-specific, focusing *inter alia* on the state of each plaintiff's knowledge, the type of vehicle paint applications, vehicle usage patterns, prescription and mitigation.

In short, the Court does not find that common factual issues predominate over individualized issues.

### D. Differences in Applicable State Substantive Laws

Plaintiffs have the burden of establishing that variations in the laws of the 50 jurisdictions on fraudulent concealment do not "swamp any common issues and defeat predominance." *Castano,* 84 F.3d at 741. Unlike the plaintiffs in *Castano* and many other cases in which class certification has been denied, plaintiffs have winnowed their legal claims to one cause of action for fraudulent concealment instead of asserting a laundry list of claims running the gamut from breach of warranty to negligence to fraud.[4] Still, there are significant variations in the law of fraudulent concealment from state to state. Further, these disparities in state law compound the problem of factual differences among plaintiffs' claims.

Plaintiffs' contention that there are only a handful of state law variations in a fraudulent concealment claim is an oversimplification. Further, their proposed jury charges and interrogatories fall far short of addressing the nuances in state law which must be captured in any jury charge that does not invite reversal on appeal. *See Matter of Rhone–Poulenc Rorer, Inc.,* 51 F.3d 1293, 1300 (7th Cir.1995), *cert. denied,* 516 U.S. 867, 116 S.Ct. 184, 133 L.Ed.2d 122 (1995) (federal court may not amalgamate state law differences on the law of negligence into an *Esperanto* jury instruction). Indeed, no single accurate, comprehensible fraudulent concealment charge has been suggested to the Court. Nor is the Court able to formulate one. Plaintiffs' proposed fraudulent nondisclosure charge is based on a book of federal pattern jury instructions, which expressly disclaims having made a full catalog of state law variations. *See* 3 Edward J. Devitt, *et al.,* Federal Jury Practice and Instructions Fourth, at 80, *et seq.,* at 131 (1992). As far as the Court has been able to determine, state law variations exist necessitating multiple jury charges on each of the following issues: the burden of proof, the duty to disclose, materiality, reliance, and the measure of damages. Further, plaintiffs have not pointed to the law of any jurisdiction to determine how a "defect" is to be legally defined for the jury, and they do not propose to instruct the jury on this issue at all. Rather, they propose to ask the jury the question, "Did the defendant actively conceal the existence of a defect in its paint process giving rise to a duty to disclose?"

---

4. Indeed, the current master complaint was preceded by several earlier versions in which various causes of action were asserted. Litigating the facial validity of these claims under the laws of only a handful of states consumed years of motion practice. Earlier complaints included claims for breach of implied warranty, breach of express warranty, negligent misrepresentation, and Moss–Magnuson Act violations.

A few examples of the variations in state law will suffice to illustrate the magnitude of the problem. State law burdens of proof in fraudulent concealment cases vary from "clear and convincing evidence," which is variously defined, to a preponderance of the evidence. *See, e.g., Kopeikin v. Merchants Mortgage & Trust Corp.,* 679 P.2d 599, 601 (Colo.1984) (preponderance of the evidence); *Nelson v. Cheney,* 224 Neb. 756, 401 N.W.2d 472, 476 (1987) (same); *OMI Holdings, Inc. v. Howell,* 260 Kan. 305, 918 P.2d 1274, 1299 (1996) (clear and convincing evidence); *Lockard v. Carson,* 287 N.W.2d 871, 874 (Iowa 1980) (clear and convincing preponderance of the evidence); *Fred C. Walker Agency, Inc. v. Lucas,* 215 Va. 535, 211 S.E.2d 88, 92 (1975) (stating that clear and convincing evidence "does not mean clear and unequivocal evidence"); *Weeks v. Baker & McKenzie,* 63 Cal.App.4th 1128, 1168, 74 Cal.Rptr.2d 510 (Cal.App.1998) (clear and convincing evidence must be "clear, explicit, and unequivocal").

Plaintiffs propose to omit a national jury instruction on the issue of a duty to disclose, contending that the issue is a question of law everywhere except for Alabama. Hence, they assert that the issue can be resolved by pretrial motion practice. However, other jurisdictions besides Alabama leave the existence of a duty to disclose to the jury. *See Woodall v. Orkin Exterminating Co.,* 175 Ga.App. 83, 332 S.E.2d 173, 174–75 (1985) (Georgia law) (whether homeowner owed duty of full communication by exterminator presented question of fact for the jury); *Gregory v. Novak,* 121 Or.App. 651, 855 P.2d 1142, 1144 (1993) (Oregon law) (extent to which a misrepresentation is misleading and therefore imposes a duty of disclosure is a question of fact); *Camp v. First Federal Savings & Loan,* 12 Ark.App. 150, 155, 671 S.W.2d 213 (Ark.App.1984) (whether relationship between parties created duty to speak is jury question). Further, even when the Court determines as a matter of law whether a state of alleged facts is sufficient to give rise to a duty, a jury must still determine whether the circumstances that give rise to the duty actually exist. *See Jones Distributing Co. v. White Consolidated Industries, Inc.,* 943 F.Supp. 1445, 1474 (N.D.Iowa 1996) (Iowa law). This requires an accurate for-

mulation of those circumstances under every jurisdiction's laws in order to pose the right questions.

Plaintiffs acknowledge that state law has applied varying standards to determine whether the defendant had a duty to disclose particular facts but claims that these standards can be lumped into three variations: (1) where a defendant makes a partial disclosure; (2) where a defendant is in a position of superior knowledge; or (3) where a defendant actively conceals material facts. This Court does not believe that this is the case. For example, some states require a fiduciary or some type of special confidential relationship to impose a duty to disclose (*e.g.,* Maine, Maryland), while other jurisdictions such as Montana and Colorado do not require such a relationship. *Compare Brae Asset Fund, L.P. v. Adam,* 661 A.2d 1137, 1140 (Me.1995) (no duty to disclose absent fiduciary or confidential relationship), *and Lubore v. R.P.M. Assoc.,* 109 Md.App. 312, 674 A.2d 547, 555 (1996) (same), *with L. Amundsen v. Wortman,* 238 Mont. 207, 777 P.2d 315, 317 (1989) (duty to disclose can arise if "special circumstances" surround the transaction), *and Mallon Oil Co. v. Bowen/Edwards Assoc., Inc.,* 940 P.2d 1055, 1059 (Colo.App.1996) (listing situations in which party to business transaction has duty to disclose). Superior knowledge of alleged defects may create a duty to disclose in the absence of a special or confidential relationship in some states, while this is not true in others. *Compare Ceribelli v. Elghanayan,* 990 F.2d 62, 64 (2d Cir.1993) (New York law recognizes disclosure duty in absence of fiduciary relationship when one party has superior knowledge), *with Urman v. South Boston Savings Bank,* 424 Mass. 165, 674 N.E.2d 1078, 1081 (1997) (silence not a basis for fraud even when seller has knowledge of weakness in thing sold and fails to disclose it). In other cases the issue of the existence of a duty is dependent on the facts and circumstances of each case, considering the nature of the product, the parties' relationship, the importance of the information and the parties' knowledge of the product's condition. *See Patton v. McHone,* 822 S.W.2d 608, 615 (Tenn.App.1991); *cf. Bunge Corp. v. GATX Corp.,* 557 So.2d 1376, 1383–

84 (La.1990) (listing factors). Further, because the existence of a duty is a relational inquiry that examines the facts relating to the defendant and the facts relating to the individual plaintiff at the time of the transaction in issue, the issue does not appear appropriate for classwide determination when the knowledge of individual plaintiffs varies, as does whether they were recipients of partial statements.

The materiality issue is also subject to subtleties in state laws not reflected in plaintiffs' proposed charge. For example, Massachusetts imposes a duty to disclose only facts that are basic to the transaction rather than those that are simply material. *See Wolf v. Prudential–Bache Securities, Inc.*, 41 Mass. App.Ct. 474, 672 N.E.2d 10, 12 (1996). In Colorado, the test of materiality is whether the information at issue *might* have affected plaintiff's action, whereas in Pennsylvania the misrepresentation must have been of such character that if disclosed it *would* have prevented the transaction. *Compare Ackmann v. Merchants Mortgage & Trust Corp.*, 645 P.2d 7, 14 (Colo.1982), *with Sewak v. Lockhart*, 699 A.2d 755, 760 (Pa.Super.1997).

Standards of reliance also vary from state to state. As the Supreme Court recently recognized in *Field v. Mans*, 516 U.S. 59, 72–73, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995), states have adopted at least three different standards on the question of reliance—actual reliance, justifiable reliance, and reasonable reliance. An accurate jury charge would have to reflect the proper definition and tests for each type of reliance under each state's laws. Finally, as to damages, the courts are divided over whether the "benefit of the bargain" rule or the "out of pocket" rule applies. *See generally* W. Page Keeton, *et al.*, Prosser and Keeton on Torts, § 110 (5th ed. 1984) ("American courts are divided over two standards of measurement"). In summary, differences in state law combined with peculiarities in the facts combine to make national class treatment unmanageable and unfair.

### E. Superiority

As the Fifth Circuit observed in *Castano*, "the greater the number of individual issues, the less likely superiority can be estab-

lished." 84 F.3d 734 at 745 n. 19 (*citing American Medical Systems*, 75 F.3d at 1084–85). The Court has already noted that there are extensive manageability problems in this case resulting from the need to determine and apply the law of 50 jurisdictions and in trying to isolate common issues from individualized issues. Even if it were appropriate to fragment a core liability trial on Ford's conduct from minitrials on causation, reliance, damages and affirmative defenses, this would seem to defeat the purported economies of class treatment. *See In re Masonite Corp. Hardboard Siding Products Liability Litigation*, 170 F.R.D. 417, 425–26 (E.D.La. 1997) (making similar observation). Moreover, in a real trial there is often overlapping proof on issues such as manufacturer conduct, causation, reliance, and the statute of limitations, so that proof in one phase will be revisited in another. For example, the core issue of fraudulent concealment involves whether the plaintiffs knew or had reasonable access to the information allegedly concealed from them. This inquiry would overlap with the reliance inquiry which must be determined on an individualized basis in the second phase of each case. Consideration of this issue in the fraudulent concealment phase and again in individual reliance trials can violate the Seventh Amendment by having a second jury reconsider factual questions decided by the first. *See Castano* at 750–51.

The Court is also concerned about an issue that was not discussed in the briefs. Plaintiffs do not state what they propose to do with the punitive damages claims they asserted in the Master Complaint. Some states provide for punitive awards in fraud cases. *See, e.g., Pittsburgh Live, Inc. v. Servov*, 419 Pa.Super. 423, 615 A.2d 438, 442 (1992); *Kelly v. Defoe Corp.*, 223 A.D.2d 529, 636 N.Y.S.2d 123, 124 (N.Y.A.D.1996); *Poe v. Sears, Roebuck & Co.*, 1998 WL 113561, *3 (N.D.Ga.1998). Assuming that the two class representatives are not proposing to abandon the claim for putative class members, and since the issue is not listed as a common one for Phase I of the trial, the Court assumes that it would be handled in the second phase. However, this Court does not see how such a

claim could be adjudicated by a special master in an administrative claims proceeding. Further, even if there were separate jury trials of punitive damages that did not violate the Seventh Amendment, evidence of the defendant's misconduct would have to be revisited in the second trial to meet various state law tests for punitive damages. *See, e.g., Pittsburgh Live,* 419 Pa.Super. at 430, 615 A.2d 438 (requiring "acts of malice, vindictiveness and a wholly wanton disregard of the rights of others"); *Kelly,* 223 A.D.2d at 529, 636 N.Y.S.2d at 123 (punitive damages recoverable for fraud "where the fraud is aimed at the public generally, is gross, and involves high moral culpability."); *Nappe v. Anschelewitz, Barr, Ansell & Bonello,* 97 N.J. 37, 49–50, 477 A.2d 1224, 1230–31 (N.J. 1984) (the defendant's conduct "must have been wantonly reckless or malicious" to warrant a punitive award under New Jersey law.). The Court does not see how a second jury could decide whether the fraudulent conduct was malicious or wanton, for example, without considering the same evidence that would be presented to establish the fraud in the first place. Such duplication would eliminate any efficiency achieved by trying the fraudulent concealment issue on a classwide basis.

Plaintiffs argue that without a class action meritorious claims will go unasserted because of the costs of litigating a complex case in relation to individual recoveries. It is true that the most compelling rationale for finding superiority in a class action is the existence of a negative value suit. *Castano,* 84 F.3d at 748. However, before any plaintiffs could recover here, they would have to hire experts and litigate many aspects of their cases on an individual basis, regardless of whether certain issues were certified. Under these circumstances, it is not obvious to this Court that a class action is superior to proceeding in individual lawsuits. As the Fifth Circuit noted in *Blue Bird,* "if certification will in actuality require a multitude of minitrials then the justification for class certification is absent." *State of Alabama v. Blue Bird Body Co., Inc.,* 573 F.2d 309, 328 (5th Cir. 1978).

In addition, many states offer multiple damages and/or attorneys' fees to successful claimants under their consumer protection laws. Ford points out that there are 336 actual lawsuits against the company relating to paint concerns on vehicles of the model years at issue here. These facts tend to undermine the negative value argument.

Finally, plaintiffs refer to recent authorities in which class certifications were approved in the context of approving classwide settlements. *See, e.g., Hanlon v. Chrysler Corp,* 150 F.3d 1011, 1998 U.S. App. LEXIS 11957 (9th Cir.1994); *see also In re Prudential Insurance. Company,* 148 F.3d 283 (3d Cir.1998). These decisions do not, however, compel a different result here. In *Amchem,* the Supreme Court held that a district court confronted with a request for a settlement-only class certification "need not inquire whether the case, if tried, would present intractable management problems." *Amchem Products, Inc. v. Windsor,* 521 U.S. 591, 117 S.Ct. 2231, 2248, 138 L.Ed.2d 689 (1997); *In re Ford Motor Co. Ignition Switch,* 174 F.R.D. 332, 350 (D.N.J.1997). This is precisely the inquiry the Fifth Circuit requires this Court to make, however, when parties seek to certify a class for trial. Further, in the cases cited by plaintiffs, no party developed a record as to individualized issues and state law complexities because class certification was not contested, and the parties agreed to settle. For these reasons, the Court does not find the settlement class cases compelling.

## III. CONCLUSION

The Court acknowledges that the class proposed by the plaintiffs is not the incubus that the Fifth Circuit faced in *Castano* where plaintiffs sought to certify a class of millions of people who were addicted to smoking since 1943. Nevertheless, *Castano* explicitly prohibits the Court from certifying a class now and worrying about how to try it later. It also requires this Court to make a *de novo* analysis of state law variations before determining that common issues of law and fact predominate. Having made these two inquiries, the Court simply cannot conclude that this matter should proceed as a class action.

For these reasons, plaintiffs' motion for class certification is DENIED.