# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-01-00610-CV

**Ford Motor Company; Leif Johnson Ford, Inc.; and Fred Capdeville, Appellants**

**v.**

**Barry Sheldon; Matthew Rueter; Margaret Dunayer; John Porter; William Dobbs; James Beasley; and B. J. Sanders, individually and on behalf of all others similarly situated, Appellees**

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 53RD JUDICIAL DISTRICT NO. 93-02721, HONORABLE JOHN K. DIETZ, JUDGE PRESIDING

## O P I N I O N

Ford Motor Company brings this interlocutory appeal from a trial court order certifying a class action. *See* Tex. Civ. Prac. & Rem. Code Ann. § 51.014 (a)(3) (West 2003). Ford appeals the order certifying the class action, claiming the trial court abused its discretion in: (1) finding questions to be "common" even though the jury could find different answers to the questions for different class members; (2) holding that the "common" questions "predominate" over individual issues; (3) adopting the trial plan proposed by the plaintiffs without knowing how the claims can and will likely be tried; and (4) certifying a "paid repaint" class because the members of the class could not be clearly ascertained by reference to objective criteria. Because we agree that the trial court

abused its discretion in certifying the class, we will reverse the trial court's order granting class certification and remand this cause to the trial court.

## PROCEDURAL HISTORY

This lawsuit was originally filed in March of 1993. Several owners of certain types of Ford vehicles, individually and on behalf of all others who bought similar vehicles in Texas, brought this class action against Ford Motor Company, a Ford dealer, and a Ford district manager. The suit was for damages for peeling paint, allegedly caused by the lack of spray primer in the paint process on certain 1984-1993 vehicle models.[1] Sheldon, Dunayer, Dobbs, and Beasley ("plaintiffs")[2] claim that the original paint jobs on their vehicles were defective because the paint was unduly susceptible to peeling when exposed to sunlight. The trial court issued an order certifying the lawsuit as a class action in 1997. Ford appealed the certification order, and this Court modified the plaintiffs' proposed class definition and upheld the trial court's certification. *See Ford Motor Co., Inc., v. Sheldon*, 965 S.W.2d 65 (Tex. App.—Austin 1998), *rev'd*, 22 S.W.3d 444 (Tex. 2000).

On appeal, the supreme court reversed the decision of this Court on the grounds that the amended class definition was not readily ascertainable and remanded the case without prejudice. *See Sheldon*, 22 S.W.3d 444. The plaintiffs again moved to have their claims certified as a class action. In October 2001, the trial court issued an order that certified the following two classes:

[1] Generally speaking, this case involves Deceptive Trade Practices Act ("DTPA") and implied warranty claims brought by the plaintiffs against Ford. *See* Tex. Bus. & Com. Code Ann. §§ 2.314;17.41-.63 (West 2003).

[2] Three other plaintiffs, Rueter, Porter, and Sanders, no longer wish to serve as class representatives and are pursuing their claims individually.

Class 1: All persons who purchased a new 1984-1993 Ford F-Series Truck, 1984-1993 Ford Bronco, 1984-1989 Ford Bronco II, 1984-1992 Ford Ranger or 1987-1989 Ford Mustang in Texas which was painted with high build electrocoat or medium build electrocoat and no spray primer and who still own their vehicles, excluding persons who purchased pursuant to a fleet account or a fleet identification number.

Class 2: All persons who purchased a new 1984-1993 Ford F-Series truck, 1984-1993 Ford Bronco, 1984-1989 Ford Bronco II, 1984-1992 Ford Ranger or 1987-1989 Ford Mustang in Texas which was painted with high build electrocoat or medium build electrocoat and no spray primer and who no longer own their vehicles, but paid Ford or a Ford dealership to repair peeling or flaking paint on their vehicles while they owned it, excluding persons who purchased vehicles pursuant to any fleet account or fleet identification number.

The court appointed Dunayer, Dobbs, and Beasley (who still owned their vehicles) to represent the "all original purchasers" class. The court appointed plaintiff Sheldon (who no longer owns his vehicle) to represent the "paid repaint" class. The trial court's order also adopted and incorporated plaintiffs' proposed trial plan in its entirety. It is from this order that Ford now appeals.

**FACTUAL BACKGROUND**

In the early 1980s, Ford removed spray primer from its paint process as a cost-saving measure. Before that time, Ford applied low-build electrocoat primer to sheet metal and then applied a spray primer before adding the enamel topcoat. Under the new process, Ford replaced low-build electrocoat and spray primer with medium- or high-build electrocoat primer and then applied the topcoat directly to the electrocoat.[3]

---

[3] The new process was adopted for F-Series Trucks, Broncos, Bronco IIs, Rangers, and Mustangs.

The plaintiffs, who purchased various Ford vehicles, argue that because electrocoat is not weather-resistant, removing the primer from the paint process caused the paint on many vehicles to delaminate. When exposed to ultraviolet sunlight, the enamel paint coat could separate from the vehicle's metal surface within 18 to 36 months. The details of the plaintiffs' vehicles are as follows:

| Plaintiff | Vehicle | Sale Date | First noticed peeling after sale date |
| --- | --- | --- | --- |
| Barry Sheldon | 1987 Ford Ranger | January 1987 | 18-22 months |
| William Dobbs | 1990 F-150 | February 1990 | 4 years |
| Margaret Dunayer | 1990 F-150 | December 1990 | 17-18 months |
| James Beasley | 1990 Bronco | January 1990 | 4 years |

The circumstances under which the four vehicles were painted varied extensively. The vehicles were painted with different color topcoats, with different kinds of high-build electrocoat primer, at different assembly plants that used different paint application systems, and at different times.

In addition, each of the four vehicles was exposed to varying environmental conditions. Sheldon regularly drove his vehicle on gravel and dirt roads. Sheldon also admitted to washing his truck with a plastic scrubber. Before this suit was filed, Sheldon had his truck repainted. However, in November of 1993, Sheldon's truck was totaled in a car accident and disposed of before it could have been inspected for the purposes of this lawsuit.

4

Ford's paint expert inspected Dunayer's truck and concluded that the paint was suffering from the effects of acid-rain damage and stone chipping. Dobbs first noticed paint peeling off of his truck after a hailstorm. His vehicle had been exposed to hail on at least three or four occasions and had accumulated nearly 50,000 miles. Similarly, Beasley's vehicle began to peel after it had accumulated 50-60,000 miles. However, the peeling only occurred on the hood of the vehicle. Ford's paint expert concluded the damage was caused by cold water repeatedly hitting the hot surface of the vehicle's hood.

Both Ford and the plaintiffs' paint experts agree that environmental factors and differences in paint application processes all contribute to how vulnerable a vehicle's paint will be to peeling from exposure to sunlight. In addition, the paint experts described other potential causes of paint peeling including: dirt particles in the paint, oil present on the vehicles before some of the layers were applied, variations in the paint materials used, variations in the manufacturing process (including oven temperatures), variations in environmental factors (including acid-rain exposure and excessive industrial chemical fall-out), and variations in how the vehicles were treated by the owners of the vehicles (*i.e.*, waxing and washing.)

The trial court found the following questions of law or fact were common to each class:

(1) Was the paint process used on the vehicles defective because it lacked spray primer?

(2) Did Ford know the paint process was defective because it did not contain spray primer?

5

(3)  When did Ford know that the paint process was defective because it did not contain spray primer?

(4)  Did Ford disclose that its paint process was defective?

(5)  When did Ford disclose that its paint process was defective?

(6)   Did Ford have a duty to disclose the defect?

(7)  Does the discovery rule apply to Plaintiffs' claims? and

(8)  Did Ford breach the implied warranty of merchantability by selling vehicles painted without spray primer?

The trial court adopted, in its entirety, the trial plan proposed by the plaintiffs. The trial plan provided for a common-issues trial in which a single jury would decide the outcome of issues common to each member of the class. The plan listed fourteen jury questions to be presented to the jury at the end of the common-issues trial. The fourteen jury questions asked the jury to consider the common questions above, as well as the following topics for both classes:

(1)  Was the failure, if any, of Ford to comply with a warranty a producing cause of damages to Plaintiffs who purchased these vehicles?

(2)  Did Ford engage in any false, misleading, or deceptive act or practice that was a producing cause of damages to Plaintiffs who purchased these vehicles?

(3)  Did Ford engage in any unconscionable action or course of action that was a producing cause of damages to Plaintiffs who purchased these vehicles?

The plan provided for the possibility of having additional proceedings after the common issues trial. For example, the plan suggested that post-trial issues would be dealt with through class members submitting sworn proofs of claims that their vehicles were damaged. It

6

suggested that if individual inspections of vehicles is necessary, the court could establish a schedule for inspections at Ford dealerships where experts from both parties would inspect the vehicles to determine if the vehicles lacked spray primers and if the lack of spray primers caused the vehicles' paint to peel. If the experts disagreed on causation, the court could give the parties the opportunity to resolve disputed claims through arbitration or mediation. For those cases not resolved through arbitration or mediation, a second trial might become necessary. In that event, the plan suggested that individual disputed cases might be placed in groups based on Ford's proof regarding a common cause of the peeling (other than lack of primer). For example, cases involving vehicles where Ford argues the peeling was caused by acid rain would be tried together.

**DISCUSSION**

*Requirements of Class Certification*

A class action is used in order to eliminate or help reduce the threat of repetitive litigation, prevent inconsistent resolutions in similar cases, and provide a means to address individual claims that are too small to make individual actions economically viable. *Sheldon*, 22 S.W.3d at 452. Efficiency and economy of litigation are the primary purposes of the class-action device. *See id.* (discussing the origins and the general design of the class-action device). If used properly, a class action can save the parties' and the court's resources by trying class-wide issues in an economical manner. *Id.* (citing *General Tel. Co. v. Falcon*, 457 U.S. 147, 155 (1981)).

In order to be certified as a class action, a class must satisfy all the requirements of rule of civil procedure 42(a): (1) numerosity—the members of the class are so numerous that joinder is impracticable; (2) commonality—the class has questions of fact or law that are common to each

7

member; (3) typicality—the representative parties' claims or defenses are typical of the class members' claims or defenses; and (4) adequacy of representation—the parties representing the class will adequately and fairly represent the interests of all members of the class. *See* Tex. R. Civ. P. 42(a); *Southwestern Ref. Co. v. Bernal*, 22 S.W.3d 425, 435 (Tex. 2000).

The trial court found this case satisfied the prerequisites for class certification listed in rule 42(a). It concluded that the commonality requirement was met because the lack of a spray primer was common to all the vehicles at issue in this case, in spite of the fact that the paint processes varied at different plants. The trial court also concluded that the claims or defenses of the parties representing the two classes in this case were typical of the claims and defenses of the corresponding class. For both classes, the parties claim that because the paint process did not include a spray primer, their vehicles were damaged.

In addition to satisfying all the requirements of rule 42(a), the class must also satisfy at least one of the subparts of rule 42(b). *See* Tex. R. Civ. P. 42(b). Here, the trial court found that the plaintiffs established that this class action satisfies rule 42(b)(4). Rule 42(b)(4) provides:

> (b) An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:
>
> . . . .
>
> (4) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

Tex. R. Civ. P. 42(b)(4).

The trial court concluded that this case satisfied the requirement that questions of law or fact common to the class predominate over questions affecting only individual members and that class treatment be superior to other available methods for the fair and efficient adjudication of the controversy. *See id.*; *Bernal*, 22 S.W.3d at 433. The trial court also concluded that because the damages each class member is seeking are relatively small, the damages would not justify paying the attorney's fees and litigation costs for individual claims.

### Standard of Review

A trial court is given broad discretion in defining a class and deciding whether to grant or to deny a class certification. *See Intratex Gas Co. v. Beeson*, 22 S.W.3d 398, 406 (Tex. 2000). On interlocutory appeal, this Court reviews a trial court's decision granting class certification under an abuse of discretion standard. *Id.*; *see also Tana Oil & Gas Corp. v. Bates*, 978 S.W.2d 735, 740 (Tex. App.—Austin 1998, no pet.). If a trial court abuses its discretion when certifying a class action, the certification order must be reversed. *See Bernal*, 22 S.W.3d at 439; *see also Schein v. Stromboe*, 102 S.W.3d 675, 691 (Tex. 2002).

When deciding whether to certify a class, the trial court may consider the pleadings, other material in the record, and evidence presented at the hearing. *National Western Life Ins. Co. v. Rowe*, 86 S.W.3d 285, 292-93 (Tex. App.—Austin 2002, no pet.). A trial court must perform a "rigorous analysis" before ruling on class certification to determine whether all prerequisites to certification have been met. *Schein*, 102 S.W.3d at 690. A trial court must demonstrate its actual compliance with rule 42 because compliance will not be presumed. *Id.* at 691. Therefore, a "trial court has discretion to rule on class certification issues, and some of its determinations—like those

9

based on its assessment of the credibility of witnesses, for example—must be given the benefit of the doubt." *Id.* However, we are not required to indulge every presumption in favor of the trial court's ruling. *Bernal*, 22 S.W.3d at 434-35; *see also Schein*, 102 S.W.3d at 691 ("the trial court's exercise of discretion cannot be supported by every presumption that can be made in its favor"). The "certify now and worry later" approach has been rejected by the supreme court. *Schein*, 102 S.W.3d at 689 (quoting *Bernal*, 22 S.W.3d at 435). The trial court's certification order must demonstrate actual, not presumed, compliance with the certification requirements of rule 42. *Id.* at 691.

*Predominance*

We will consider the predominance requirement first because it "is one of the most stringent prerequisites to class certification." *Bernal*, 22 S.W.3d at 433. "The predominance requirement is intended to prevent class action litigation when the sheer complexity and diversity of the individual issues would overwhelm or confuse a jury or severely compromise a party's ability to present viable claims or defenses." *Schein*, 102 S.W.3d at 689. Rule 42(b)(4) provides the following list of non-exhaustive factors for a trial court to consider when deciding whether the predominance requirement is met:

> (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions;
>
> (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class;
>
> (C) the desirability or undesirability of concentrating the litigation in the particular forum;
>
> (D) the difficulties likely to be encountered in the management of the class action.

10

Tex. R. Civ. P. 42(b)(4).

In its certification order, the court concluded that there was no evidence that individual members of the two classes had an interest in controlling the prosecution of individual actions and that the expert testimony and amount of discovery necessary to adjudicate these claims weighs in favor of this finding. The trial court also concluded that any litigation already enacted concerning this matter would not affect the desirability of treating this case as a class action. It stated that it considered the discovery completed by the parties and the pretrial matters that had already been resolved by the court and concluded that it was desirable to try the case as a class action. In addition, the trial court asserted that it considered the difficulties that might be encountered in trying this case as a class action but decided that the case could be tried as a class action.

In order to determine if common issues predominate, courts identify the substantive issues that will control the outcome of the case, assess which issues will predominate, and determine if the issues that predominate are those common to the class. *Bernal*, 22 S.W.3d at 434. The test for predominance is not whether common issues outnumber uncommon issues but whether common or individual issues will be the object of most of the efforts of the litigants and the court. *Id.* If, after common issues are resolved, presenting and resolving individual issues is likely to be an overwhelming or unmanageable task for a jury, then common issues do not predominate. *Id.*

Class members are held to the same standards of proof as they would be if they sued individually. *Schein*, 102 S.W.3d at 693. "[A] class action eliminates the necessity of adducing the same evidence over and over again in a multitude of individuals actions; it does not lessen the quality of evidence required in an individual action or relax substantive burdens of proof." *Id.* at 693-94.

11

Class actions are only procedural devices and may not "diminish any substantive rights or obligations of any parties to a civil action." *Bernal*, 22 S.W.3d at 437; *see also* Tex. R. Civ. P. 815. Any proposal to "expedite resolving individual issues" must not prevent a party from presenting relevant defenses or claims without consent. *Bernal*, 22 S.W.3d at 436. Both parties must be allowed to adequately present any defenses or claims relevant to their case. *Id.* at 437. A defendant is entitled to challenge the credibility of and its responsibility for each claim individually, even if it is not entitled to separate trials. *See id.* However, if Ford chooses to challenge the credibility of and its responsibility for each claim individually, then what may nominally be a class action initially would degenerate in practice into multiple lawsuits separately tried. *Id.* at 437-38.

The substantive issues that will control the outcome of this case include the following: (1) whether Ford's paint process was defective; (2) when and if Ford knew the paint process was defective; and (3) whether the allegedly defective paint process caused the paint on the class members' vehicles to peel.

*(1) Defect*

The trial court found the question of defect—"was the paint process used on the vehicle defective because it lacked spray primer"—common to the class. While the vehicles at issue were all painted with some version of high-build electrocoat primer rather than spray primer, these vehicles were not painted using one uniform paint process. Instead, the paint process in the vehicles reflect four types of body materials, three different electrocoats, eight plants in different locations, five models, ten model years, and several dozen colors. It is a combination of these factors that will determine whether extended exposure to sunlight will cause the paint on any given vehicle to peel,

12

and therefore, be defective. *See Sheldon*, 965 S.W.2d at 70; *see also In re Ford Motor Co. Vehicle Paint Litig.*, 182 F.R.D. 214, 220 (E.D. La. 1998).

Both plaintiffs' and Ford's paint experts agree that whether or not spray primer was used does not in and of itself dictate whether the vehicle will be vulnerable to peeling caused by exposure to sunlight. All components of the paint system must be examined—the type, color, thickness, and bake quality of the topcoat; the type of high-build electrocoat primer; and the type of metal used in the vehicle's body—in order to assess how resistant the paint system will be to sunlight exposure. In addition, differences in environmental factors will also play a key role in determining whether a particular paint job was defective. Even in the small sample of vehicles present in this case, there are extreme differences in environmental factors. Some of the individual vehicles were exposed to repeated hailstorms, to repeated driving on dirt and gravel roads, and to cleaning with a plastic scrubber.

Moreover, when considering the defect question, a jury must separately examine both the technical characteristics and peeling rates of each paint system used on the subject vehicles before deciding whether the system on any given claimant's vehicle is defective. The experts agree that a system-specific analysis could lead a jury to conclude that some paint systems were excessively vulnerable to peeling while others were not. Yet several of the trial court's proposed jury questions ask the jury to decide on an "all-or-nothing" basis whether Ford's vehicles sold without spray primer were defective. The paint systems at issue differed by model and model year. They also differed by assembly plant, topcoat color, type of electrocoat used, and by the type and quantity of UV radiation "blockers" added to the topcoat. Therefore, the jury would be given the

13

unmanageable task of separately examining numerous paint systems, assessing their different failure

rates, and making separate determinations about which combination of processes, if any, is defective.

When the court in *Ford Motor* considered the issue of defect, it found:

> [I]t is doubtful that the issue of product "defect" is common to all proposed class members. This case does not involve a single failure event or a simple fungible product. Rather, Ford's challenged course of conduct spanned at least seven years and involved different models of vehicles, made of different materials, painted a variety of colors at different plants, using different paint formulae. Further, Ford's paint processes changed over time.

*In re Ford Motor*, 18 F.R.D. at 220.[4] The court concluded that these factors suggested that the

plaintiffs' vehicles were "not similarly situated on the defect issue." *Id.*[5] Like the court in *Ford*

*Motor*, we are convinced that individual considerations regarding the issue of defect will predominate

at trial.[6]

---

[4] Because rule 42 is based on the federal rule of civil procedure governing class actions, federal court decisions dealing with class actions are persuasive authority. *Southwestern Ref. Co. v. Bernal*, 22 S.W.3d 425, 433 (Tex. 2000).

[5] The facts in *In re Ford Motor Co. Vehicle Paint Litigation* are almost identical to the facts in this case. For example, in this case the plaintiffs' paint expert has testified that solid color Ford vehicles, when painted with proper thickness and proper bake, should not be at risk of peeling due to UV radiation, even though they have high-build electrocoat and not spray primer. The plaintiffs' expert's testimony in *Ford Motor* was identical. *In re Ford Motor Co. Vehicle Paint Litig.*, 182 F.R.D. 214, 220 (E.D. La. 1998).

[6] While the paint process might be tested for defectiveness under one set of defined circumstances, many of the additional factors discussed above will inevitably be introduced, causing the analysis to degenerate into confusing "mini-trials" on defect.

*(2) Knowledge*

The trial court declared the question, "Did Ford know the paint process was defective because it did not contain spray primer," to be common to the class. This approach to the knowledge issue is flawed because there is undisputed evidence showing that Ford's knowledge of the propensity of sunlight to damage paint evolved during the ten-year period the vehicles were being built and was different as to different paint systems. For example, Ford's paint supplier noted in January 1990 its recent discovery of gray high-build electrocoat's sensitivity to UV light. In addition, a former Ford employee testified that he saw no subject vehicle with paint flaking, other than blue or silver/gray or green metallic ones, until 1993. Further, he saw no Ranger or Mustang with peeling until two years after he saw peeling F-Series trucks, demonstrating that knowledge of peeling varied by color and vehicle line.

Knowledge, like defect, will involve individual determinations. The evidence might show that Ford had knowledge of a paint defect on a certain date and not before. This finding would prohibit recovery of damages for vehicles that were painted before this date. The evidence might also show that Ford became aware of a paint-peeling problem on some models and not others, or became aware of a paint-peeling problem at different times for different models.

When considering the issue of knowledge, the court in *Ford Motor* noted that there was evidence showing that Ford's knowledge of an alleged defect changed over time. *In re Ford Motor*, 182 F.R.D. at 220. The court noted that the questions of knowledge and concealment may be different for different members of the class and concluded that when a "defendant's conduct means different things for different class members, trying the issue of its liability for that conduct on an

15

aggregated basis is problematic." *Id.* As in *Ford Motor*, there is evidence that Ford's state of knowledge was not uniform over the period in issue. Because of the fluid nature of when and if Ford had knowledge of the alleged defect, resolving that issue will depend on individual considerations and proof, further evidence that this action is unsuitable for class treatment.

### *(3) Causation*

In order to recover money damages from Ford, a vehicle owner must show that his vehicle experienced paint peeling caused by UV degradation attributable to a lack of spray primer. In response, Ford is entitled to conduct separate discovery concerning how each owner treated his vehicle, and then enlist a paint expert to inspect the owner's vehicle and give an opinion about what caused the paint to peel. Such evidence may very well indicate that the peeling was caused by factors unrelated to the use of high-build electrocoat primer or the absence of spray primer. For example, Sheldon regularly drove his vehicle on dirt roads and washed it with a plastic scrubber. Dobbs's vehicle was exposed to hail on at least three or four occasions. Dunayer's truck had been exposed to acid rain and stone chipping. Finally, according to Ford's paint expert, damage to Beasley's vehicle was caused by cold water repeatedly hitting the hot surface of the vehicle's hood.

In *Bernal*, the supreme court determined that the causation issues were unique to each class member and therefore individual issues predominated. *Bernal*, 22 S.W.3d at 436. In that case, the supreme court noted that the distance of each member's house from the explosion, where the class members were when the explosion occurred, and whether prevailing winds blew smoke away from the members' homes would all have to be individually considered. *Id.* A lawsuit may be certified for class litigation only if it is clear that all elements of plaintiffs' proposed claims can be tried to a

16

single jury (by both plaintiffs and defendants) using evidence and arguments equally applicable to every class member. *Id.* at 435-36. "If it is not determinable from the outset that the individual issues can be considered in a manageable, time-efficient, yet fair manner, then certification is not appropriate." *Id.* at 436.

Similarly, causation issues in this case will be highly individualized. The combination of factors to consider is almost limitless. For example, whether the damages the plaintiffs complain of were caused by the actions of Ford will depend on, among other things: (1) when the vehicle was sold to the plaintiff; (2) what paint process was used on the vehicle; and (3) what environmental factors the vehicle was exposed to. The answers to these questions will vary from individual to individual and will affect a determination of whether causation is present or not. Instead, the trial court's proposed jury questions ask the jury to decide on an "all-or-nothing" basis whether Ford's sale of vehicles without spray primer was a producing cause of damages to the many plaintiffs who purchased these vehicles over a long period of time.

In considering the causation issue with Ford's allegedly defective paint jobs, the court in *Ford Motor* concluded that "the nature of the paint problem and causation would require individualized discovery, retention of experts, and trials for each plaintiff." *In re Ford Motor*, 182 F.R.D. at 221. More importantly, *Bernal* has made it clear that class actions may not diminish any substantive rights of either party. *Bernal*, 22 S.W.3d at 437. Specifically, a defendant must be given the opportunity to contest all the elements of the plaintiffs' claims. *Id.* at 438.

In *Sanneman v. Chrysler Corp.*, a similar paint-peeling case, the court determined that unless it could be shown that ultraviolet rays are the *sole* cause of the paint peeling, individual

17

determinations would be necessary. 191 F.R.D. 441, 451 (E.D. Pa. 2000). The court noted that even if ultraviolet rays are the root cause of the paint peeling, a determination will still be necessary for each vehicle as to whether any other factors contributed to the peeling. *Id.* The court went on to state:

> Because the experts do not agree that ultraviolet rays are always the root cause of delamination, or that they ever are the only cause, proof of damages would most likely have to be made vehicle by vehicle, assessed according to how much of the damage is due to these contributing factors.
>
> . . . .
>
> This type of individualized determination of damages, especially when contemplated for thousands of potential class members, weighs strongly against certification.

*Id.*

In the present case, the plaintiffs' experts agree that ultraviolet rays are not the only cause of paint peeling. Moreover, the trial court in this case originally acknowledged that because there were so many potential causes of paint peeling, the case would probably have to have a phase of individual trials after the resolution of common issues. *See Sheldon*, 965 S.W.2d at 67-68. Finally, the amount of damage attributable to the alleged defect will also have to be individually determined. "When individual rather than common issues predominate, 'the economy and efficiency intended by class action treatment are lost and the need for judicial supervision and the risk of confusion are magnified.'" *Sanneman*, 191 F.R.D. at 454 (quoting 7A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1778 (1986)).

We agree with the *Sanneman* court's conclusion:

18

> [T]he need to establish injury and causation with respect to each class member will necessarily require a detailed factual inquiry including physical examination of each vehicle, an [sic] mind-boggling concept that is preclusively costly in both time and money. We will not certify a class that will result in an administrative process lasting for untold years, where individual threshold questions will overshadow common issues regarding Defendant's alleged conduct. Accordingly, we conclude that Plaintiff has not adequately shown that common issues predominate over individual issues.

*Id.* at 449. As in *Sanneman*, establishing causation in this case will necessarily involve a physical examination of each vehicle to determine what caused its paint to peel. Additionally, it will require separate discovery of each owner concerning how the owner treated his vehicle and whether other factors contributed to the peeling. Clearly, individual threshold questions will overshadow common issues. Therefore, plaintiffs have not shown that common issues will predominate over individual issues.

## CONCLUSION

The class-certification record convinces us that common issues do not predominate. Jury determinations as to causation, knowledge, and defect will depend heavily on different information from each individual claimant. As our above discussion makes clear, individual issues will be the focus of much of the efforts of the litigants and the court; thus an impediment to class action. Resolving these individual issues for all the class members will be an unmanageable task for the jury. Additionally, Ford is entitled to challenge the credibility of and its responsibility for each claim individually.

We hold that the trial court's certification order was an abuse of discretion because questions of law or fact common to the class will not predominate. Because of this conclusion, we

19

need not consider Ford's other objections to the class action or trial plan.  We reverse the order granting certification and remand this cause back to the trial court for further proceedings consistent with this opinion.

_____

David Puryear, Justice

Before Justices B. A. Smith, Patterson and Puryear

Reversed and Remanded

Filed:   August 14, 2003