TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN







NO. 03-01-00610-CV






Ford Motor Company; Leif Johnson Ford, Inc.; and Fred Capdeville, Appellants


v.


Barry Sheldon; Matthew Rueter; Margaret Dunayer; John Porter; William Dobbs;

James Beasley; and B. J. Sanders, individually and on behalf of all

others similarly situated, Appellees







FROM THE DISTRICT COURT OF TRAVIS COUNTY, 53RD JUDICIAL DISTRICT

NO. 93-02721, HONORABLE JOHN K. DIETZ, JUDGE PRESIDING





O P I N I O N




 Ford Motor Company brings this interlocutory appeal from a trial court order
certifying a class action. See Tex. Civ. Prac. & Rem. Code Ann. § 51.014 (a)(3) (West 2003). Ford
appeals the order certifying the class action, claiming the trial court abused its discretion in: (1)
finding questions to be"common" even though the jury could find different answers to the questions
for different class members; (2) holding that the "common" questions "predominate" over individual
issues; (3) adopting the trial plan proposed by the plaintiffs without knowing how the claims can and
will likely be tried; and (4) certifying a "paid repaint" class because the members of the class could
not be clearly ascertained by reference to objective criteria. Because we agree that the trial court
abused its discretion in certifying the class, we will reverse the trial court's order granting class
certification and remand this cause to the trial court.


PROCEDURAL HISTORY


 This lawsuit was originally filed in March of 1993. Several owners of certain types
of Ford vehicles, individually and on behalf of all others who bought similar vehicles in Texas,
brought this class action against Ford Motor Company, a Ford dealer, and a Ford district manager. 
The suit was for damages for peeling paint, allegedly caused by the lack of spray primer in the paint
process on certain 1984-1993 vehicle models. (1) Sheldon, Dunayer, Dobbs, and Beasley ("plaintiffs") (2)
claim that the original paint jobs on their vehicles were defective because the paint was unduly
susceptible to peeling when exposed to sunlight. The trial court issued an order certifying the
lawsuit as a class action in 1997. Ford appealed the certification order, and this Court modified the
plaintiffs' proposed class definition and upheld the trial court's certification. See Ford Motor Co.,
Inc., v. Sheldon, 965 S.W.2d 65 (Tex. App.--Austin 1998), rev'd, 22 S.W.3d 444 (Tex. 2000). 

 On appeal, the supreme court reversed the decision of this Court on the grounds that
the amended class definition was not readily ascertainable and remanded the case without prejudice. 
See Sheldon, 22 S.W.3d 444. The plaintiffs again moved to have their claims certified as a class
action. In October 2001, the trial court issued an order that certified the following two classes:

Class 1: All persons who purchased a new 1984-1993 Ford F-Series Truck, 1984-1993 Ford Bronco, 1984-1989 Ford Bronco II, 1984-1992 Ford Ranger or
1987-1989 Ford Mustang in Texas which was painted with high build
electrocoat or medium build electrocoat and no spray primer and who still
own their vehicles, excluding persons who purchased pursuant to a fleet
account or a fleet identification number.


Class 2: All persons who purchased a new 1984-1993 Ford F-Series truck, 1984-1993 Ford Bronco, 1984-1989 Ford Bronco II, 1984-1992 Ford Ranger or
1987-1989 Ford Mustang in Texas which was painted with high build
electrocoat or medium build electrocoat and no spray primer and who no
longer own their vehicles, but paid Ford or a Ford dealership to repair
peeling or flaking paint on their vehicles while they owned it, excluding
persons who purchased vehicles pursuant to any fleet account or fleet
identification number.



 The court appointed Dunayer, Dobbs, and Beasley (who still owned their vehicles)
to represent the "all original purchasers" class. The court appointed plaintiff Sheldon (who no longer
owns his vehicle) to represent the "paid repaint" class. The trial court's order also adopted and
incorporated plaintiffs' proposed trial plan in its entirety. It is from this order that Ford now appeals.


FACTUAL BACKGROUND


 In the early 1980s, Ford removed spray primer from its paint process as a cost-saving
measure. Before that time, Ford applied low-build electrocoat primer to sheet metal and then applied
a spray primer before adding the enamel topcoat. Under the new process, Ford replaced low-build
electrocoat and spray primer with medium- or high-build electrocoat primer and then applied the
topcoat directly to the electrocoat. (3) 

 The plaintiffs, who purchased various Ford vehicles, argue that because electrocoat
is not weather-resistant, removing the primer from the paint process caused the paint on many
vehicles to delaminate. When exposed to ultraviolet sunlight, the enamel paint coat could separate
from the vehicle's metal surface within 18 to 36 months. The details of the plaintiffs' vehicles are
as follows: 


Plaintiff Vehicle Sale Date First noticed

 peeling after

 sale date


Barry Sheldon 1987 Ford Ranger January 1987 18-22 months


William Dobbs 1990 F-150 February 1990 4 years


Margaret Dunayer 1990 F-150 December 1990 17-18 months


James Beasley 1990 Bronco January 1990 4 years



 The circumstances under which the four vehicles were painted varied extensively. 
The vehicles were painted with different color topcoats, with different kinds of high-build electrocoat
primer, at different assembly plants that used different paint application systems, and at different
times.

 In addition, each of the four vehicles was exposed to varying environmental
conditions. Sheldon regularly drove his vehicle on gravel and dirt roads. Sheldon also admitted to
washing his truck with a plastic scrubber. Before this suit was filed, Sheldon had his truck repainted. 
However, in November of 1993, Sheldon's truck was totaled in a car accident and disposed of before
it could have been inspected for the purposes of this lawsuit.

 Ford's paint expert inspected Dunayer's truck and concluded that the paint was
suffering from the effects of acid-rain damage and stone chipping. Dobbs first noticed paint peeling
off of his truck after a hailstorm. His vehicle had been exposed to hail on at least three or four
occasions and had accumulated nearly 50,000 miles. Similarly, Beasley's vehicle began to peel after
it had accumulated 50-60,000 miles. However, the peeling only occurred on the hood of the vehicle. 
Ford's paint expert concluded the damage was caused by cold water repeatedly hitting the hot surface
of the vehicle's hood.

 Both Ford and the plaintiffs' paint experts agree that environmental factors and
differences in paint application processes all contribute to how vulnerable a vehicle's paint will be
to peeling from exposure to sunlight. In addition, the paint experts described other potential causes
of paint peeling including: dirt particles in the paint, oil present on the vehicles before some of the
layers were applied, variations in the paint materials used, variations in the manufacturing process
(including oven temperatures), variations in environmental factors (including acid-rain exposure and
excessive industrial chemical fall-out), and variations in how the vehicles were treated by the owners
of the vehicles (i.e., waxing and washing.)

 The trial court found the following questions of law or fact were common to each
class:


(1) Was the paint process used on the vehicles defective because it lacked spray
primer?


(2) Did Ford know the paint process was defective because it did not contain spray
primer?


(3) When did Ford know that the paint process was defective because it did not
contain spray primer?


(4) Did Ford disclose that its paint process was defective?


(5) When did Ford disclose that its paint process was defective?


(6) Did Ford have a duty to disclose the defect?


(7) Does the discovery rule apply to Plaintiffs' claims? and 


(8) Did Ford breach the implied warranty of merchantability by selling vehicles
painted without spray primer?



 The trial court adopted, in its entirety, the trial plan proposed by the plaintiffs. The
trial plan provided for a common-issues trial in which a single jury would decide the outcome of
issues common to each member of the class. The plan listed fourteen jury questions to be presented
to the jury at the end of the common-issues trial. The fourteen jury questions asked the jury to
consider the common questions above, as well as the following topics for both classes:


(1) Was the failure, if any, of Ford to comply with a warranty a producing cause of
damages to Plaintiffs who purchased these vehicles?


(2) Did Ford engage in any false, misleading, or deceptive act or practice that was
a producing cause of damages to Plaintiffs who purchased these vehicles?


(3) Did Ford engage in any unconscionable action or course of action that was a
producing cause of damages to Plaintiffs who purchased these vehicles?



 The plan provided for the possibility of having additional proceedings after the
common issues trial. For example, the plan suggested that post-trial issues would be dealt with
through class members submitting sworn proofs of claims that their vehicles were damaged. It
suggested that if individual inspections of vehicles is necessary, the court could establish a schedule
for inspections at Ford dealerships where experts from both parties would inspect the vehicles to
determine if the vehicles lacked spray primers and if the lack of spray primers caused the vehicles'
paint to peel. If the experts disagreed on causation, the court could give the parties the opportunity
to resolve disputed claims through arbitration or mediation. For those cases not resolved through
arbitration or mediation, a second trial might become necessary. In that event, the plan suggested
that individual disputed cases might be placed in groups based on Ford's proof regarding a common
cause of the peeling (other than lack of primer). For example, cases involving vehicles where Ford
argues the peeling was caused by acid rain would be tried together.


DISCUSSION


Requirements of Class Certification

 A class action is used in order to eliminate or help reduce the threat of repetitive
litigation, prevent inconsistent resolutions in similar cases, and provide a means to address 
individual claims that are too small to make individual actions economically viable. Sheldon, 22
S.W.3d at 452. Efficiency and economy of litigation are the primary purposes of the class-action
device. See id. (discussing the origins and the general design of the class-action device). If used
properly, a class action can save the parties' and the court's resources by trying class-wide issues in
an economical manner. Id. (citing General Tel. Co. v. Falcon, 457 U.S. 147, 155 (1981)).

 In order to be certified as a class action, a class must satisfy all the requirements of
rule of civil procedure 42(a): (1) numerosity--the members of the class are so numerous that joinder
is impracticable; (2) commonality--the class has questions of fact or law that are common to each
member; (3) typicality--the representative parties' claims or defenses are typical of the class
members' claims or defenses; and (4) adequacy of representation--the parties representing the class
will adequately and fairly represent the interests of all members of the class. See Tex. R. Civ. P.
42(a); Southwestern Ref. Co. v. Bernal, 22 S.W.3d 425, 435 (Tex. 2000).

 The trial court found this case satisfied the prerequisites for class certification listed
in rule 42(a). It concluded that the commonality requirement was met because the lack of a spray
primer was common to all the vehicles at issue in this case, in spite of the fact that the paint
processes varied at different plants. The trial court also concluded that the claims or defenses of the
parties representing the two classes in this case were typical of the claims and defenses of the
corresponding class. For both classes, the parties claim that because the paint process did not
include a spray primer, their vehicles were damaged.

 In addition to satisfying all the requirements of rule 42(a), the class must also satisfy
at least one of the subparts of rule 42(b). See Tex. R. Civ. P. 42(b). Here, the trial court found that
the plaintiffs established that this class action satisfies rule 42(b)(4). Rule 42(b)(4) provides:


(b) An action may be maintained as a class action if the prerequisites of subdivision
(a) are satisfied, and in addition:


. . . .


 (4) the court finds that the questions of law or fact common to the members of
the class predominate over any questions affecting only individual
members, and that a class action is superior to other available methods for
the fair and efficient adjudication of the controversy.



Tex. R. Civ. P. 42(b)(4).

 The trial court concluded that this case satisfied the requirement that questions of law
or fact common to the class predominate over questions affecting only individual members and that
class treatment be superior to other available methods for the fair and efficient adjudication of the
controversy. See id.; Bernal, 22 S.W.3d at 433. The trial court also concluded that because the
damages each class member is seeking are relatively small, the damages would not justify paying
the attorney's fees and litigation costs for individual claims.


Standard of Review

 A trial court is given broad discretion in defining a class and deciding whether to
grant or to deny a class certification. See Intratex Gas Co. v. Beeson, 22 S.W.3d 398, 406 (Tex.
2000). On interlocutory appeal, this Court reviews a trial court's decision granting class certification
under an abuse of discretion standard. Id.; see also Tana Oil & Gas Corp. v. Bates, 978 S.W.2d 735,
740 (Tex. App.--Austin 1998, no pet.). If a trial court abuses its discretion when certifying a class
action, the certification order must be reversed. See Bernal, 22 S.W.3d at 439; see also Schein v.
Stromboe, 102 S.W.3d 675, 691 (Tex. 2002). 

 When deciding whether to certify a class, the trial court may consider the pleadings,
other material in the record, and evidence presented at the hearing. National Western Life Ins. Co.
v. Rowe, 86 S.W.3d 285, 292-93 (Tex. App.--Austin 2002, no pet.). A trial court must perform a
"rigorous analysis" before ruling on class certification to determine whether all prerequisites to
certification have been met. Schein, 102 S.W.3d at 690. A trial court must demonstrate its actual
compliance with rule 42 because compliance will not be presumed. Id. at 691. Therefore, a "trial
court has discretion to rule on class certification issues, and some of its determinations--like those
based on its assessment of the credibility of witnesses, for example--must be given the benefit of
the doubt." Id. However, we are not required to indulge every presumption in favor of the trial
court's ruling. Bernal, 22 S.W.3d at 434-35; see also Schein,102 S.W.3d at 691 ("the trial court's
exercise of discretion cannot be supported by every presumption that can be made in its favor"). The
"certify now and worry later" approach has been rejected by the supreme court. Schein,102 S.W.3d
at 689 (quoting Bernal, 22 S.W.3d at 435). The trial court's certification order must demonstrate
actual, not presumed, compliance with the certification requirements of rule 42. Id. at 691.


Predominance

 We will consider the predominance requirement first because it "is one of the most
stringent prerequisites to class certification." Bernal, 22 S.W.3d at 433. "The predominance
requirement is intended to prevent class action litigation when the sheer complexity and diversity
of the individual issues would overwhelm or confuse a jury or severely compromise a party's ability
to present viable claims or defenses." Schein, 102 S.W.3d at 689. Rule 42(b)(4) provides the
following list of non-exhaustive factors for a trial court to consider when deciding whether the
predominance requirement is met: 


(A) the interest of members of the class in individually controlling the prosecution
or defense of separate actions; 


(B) the extent and nature of any litigation concerning the controversy already
commenced by or against members of the class; 


(C) the desirability or undesirability of concentrating the litigation in the particular
forum;

(D) the difficulties likely to be encountered in the management of the class action. 


Tex. R. Civ. P. 42(b)(4).

 In its certification order, the court concluded that there was no evidence that
individual members of the two classes had an interest in controlling the prosecution of individual
actions and that the expert testimony and amount of discovery necessary to adjudicate these claims
weighs in favor of this finding. The trial court also concluded that any litigation already enacted
concerning this matter would not affect the desirability of treating this case as a class action. It stated
that it considered the discovery completed by the parties and the pretrial matters that had already
been resolved by the court and concluded that it was desirable to try the case as a class action. In
addition, the trial court asserted that it considered the difficulties that might be encountered in trying
this case as a class action but decided that the case could be tried as a class action.

 In order to determine if common issues predominate, courts identify the substantive
issues that will control the outcome of the case, assess which issues will predominate, and determine
if the issues that predominate are those common to the class. Bernal, 22 S.W.3d at 434. The test
for predominance is not whether common issues outnumber uncommon issues but whether common
or individual issues will be the object of most of the efforts of the litigants and the court. Id. If, after
common issues are resolved, presenting and resolving individual issues is likely to be an
overwhelming or unmanageable task for a jury, then common issues do not predominate. Id.

 Class members are held to the same standards of proof as they would be if they sued
individually. Schein, 102 S.W.3d at 693. "[A] class action eliminates the necessity of adducing the
same evidence over and over again in a multitude of individuals actions; it does not lessen the quality
of evidence required in an individual action or relax substantive burdens of proof." Id. at 693-94.
Class actions are only procedural devices and may not "diminish any substantive rights or obligations
of any parties to a civil action." Bernal, 22 S.W.3d at 437; see also Tex. R. Civ. P. 815. Any
proposal to "expedite resolving individual issues" must not prevent a party from presenting relevant
defenses or claims without consent. Bernal, 22 S.W.3d at 436. Both parties must be allowed to
adequately present any defenses or claims relevant to their case. Id. at 437. A defendant is entitled
to challenge the credibility of and its responsibility for each claim individually, even if it is not
entitled to separate trials. See id. However, if Ford chooses to challenge the credibility of and its
responsibility for each claim individually, then what may nominally be a class action initially would
degenerate in practice into multiple lawsuits separately tried. Id. at 437-38.

 The substantive issues that will control the outcome of this case include the
following: (1) whether Ford's paint process was defective; (2) when and if Ford knew the paint
process was defective; and (3) whether the allegedly defective paint process caused the paint on the
class members' vehicles to peel.


(1) Defect

 The trial court found the question of defect--"was the paint process used on the
vehicle defective because it lacked spray primer"--common to the class. While the vehicles at issue
were all painted with some version of high-build electrocoat primer rather than spray primer, these
vehicles were not painted using one uniform paint process. Instead, the paint process in the vehicles
reflect four types of body materials, three different electrocoats, eight plants in different locations,
five models, ten model years, and several dozen colors. It is a combination of these factors that will
determine whether extended exposure to sunlight will cause the paint on any given vehicle to peel,
and therefore, be defective. See Sheldon, 965 S.W.2d at 70; see also In re Ford Motor Co. Vehicle
Paint Litig., 182 F.R.D. 214, 220 (E.D. La. 1998).

 Both plaintiffs' and Ford's paint experts agree that whether or not spray primer was
used does not in and of itself dictate whether the vehicle will be vulnerable to peeling caused by
exposure to sunlight. All components of the paint system must be examined--the type, color,
thickness, and bake quality of the topcoat; the type of high-build electrocoat primer; and the type of
metal used in the vehicle's body--in order to assess how resistant the paint system will be to sunlight
exposure. In addition, differences in environmental factors will also play a key role in determining
whether a particular paint job was defective. Even in the small sample of vehicles present in this
case, there are extreme differences in environmental factors. Some of the individual vehicles were
exposed to repeated hailstorms, to repeated driving on dirt and gravel roads, and to cleaning with a
plastic scrubber.

 Moreover, when considering the defect question, a jury must separately examine both
the technical characteristics and peeling rates of each paint system used on the subject vehicles
before deciding whether the system on any given claimant's vehicle is defective. The experts agree
that a system-specific analysis could lead a jury to conclude that some paint systems were
excessively vulnerable to peeling while others were not. Yet several of the trial court's proposed
jury questions ask the jury to decide on an "all-or-nothing" basis whether Ford's vehicles sold
without spray primer were defective. The paint systems at issue differed by model and model year. 
They also differed by assembly plant, topcoat color, type of electrocoat used, and by the type and
quantity of UV radiation "blockers" added to the topcoat. Therefore, the jury would be given the
unmanageable task of separately examining numerous paint systems, assessing their different failure
rates, and making separate determinations about which combination of processes, if any, is defective.

 When the court in Ford Motor considered the issue of defect, it found: 


[I]t is doubtful that the issue of product "defect" is common to all proposed class
members. This case does not involve a single failure event or a simple fungible
product. Rather, Ford's challenged course of conduct spanned at least seven years
and involved different models of vehicles, made of different materials, painted a
variety of colors at different plants, using different paint formulae. Further, Ford's
paint processes changed over time. 



In re Ford Motor, 18 F.R.D. at 220. (4) The court concluded that these factors suggested that the
plaintiffs' vehicles were "not similarly situated on the defect issue." Id. (5) Like the court in Ford
Motor, we are convinced that individual considerations regarding the issue of defect will predominate
at trial. (6) 


(2) Knowledge

 The trial court declared the question, "Did Ford know the paint process was defective
because it did not contain spray primer," to be common to the class. This approach to the knowledge
issue is flawed because there is undisputed evidence showing that Ford's knowledge of the propensity
of sunlight to damage paint evolved during the ten-year period the vehicles were being built and was
different as to different paint systems. For example, Ford's paint supplier noted in January 1990 its
recent discovery of gray high-build electrocoat's sensitivity to UV light. In addition, a former Ford
employee testified that he saw no subject vehicle with paint flaking, other than blue or silver/gray or
green metallic ones, until 1993. Further, he saw no Ranger or Mustang with peeling until two years
after he saw peeling F-Series trucks, demonstrating that knowledge of peeling varied by color and
vehicle line.

 Knowledge, like defect, will involve individual determinations. The evidence might
show that Ford had knowledge of a paint defect on a certain date and not before. This finding would
prohibit recovery of damages for vehicles that were painted before this date. The evidence might also
show that Ford became aware of a paint-peeling problem on some models and not others, or became
aware of a paint-peeling problem at different times for different models.

 When considering the issue of knowledge, the court in Ford Motor noted that there
was evidence showing that Ford's knowledge of an alleged defect changed over time. In re Ford
Motor, 182 F.R.D. at 220. The court noted that the questions of knowledge and concealment may be
different for different members of the class and concluded that when a "defendant's conduct means
different things for different class members, trying the issue of its liability for that conduct on an
aggregated basis is problematic." Id. As in Ford Motor, there is evidence that Ford's state of
knowledge was not uniform over the period in issue. Because of the fluid nature of when and if Ford
had knowledge of the alleged defect, resolving that issue will depend on individual considerations
and proof, further evidence that this action is unsuitable for class treatment.


(3) Causation

 In order to recover money damages from Ford, a vehicle owner must show that his
vehicle experienced paint peeling caused by UV degradation attributable to a lack of spray primer. 
In response, Ford is entitled to conduct separate discovery concerning how each owner treated his
vehicle, and then enlist a paint expert to inspect the owner's vehicle and give an opinion about what
caused the paint to peel. Such evidence may very well indicate that the peeling was caused by factors
unrelated to the use of high-build electrocoat primer or the absence of spray primer. For example,
Sheldon regularly drove his vehicle on dirt roads and washed it with a plastic scrubber. Dobbs's
vehicle was exposed to hail on at least three or four occasions. Dunayer's truck had been exposed
to acid rain and stone chipping. Finally, according to Ford's paint expert, damage to Beasley's
vehicle was caused by cold water repeatedly hitting the hot surface of the vehicle's hood.

 In Bernal, the supreme court determined that the causation issues were unique to each
class member and therefore individual issues predominated. Bernal, 22 S.W.3d at 436. In that case,
the supreme court noted that the distance of each member's house from the explosion, where the class
members were when the explosion occurred, and whether prevailing winds blew smoke away from
the members' homes would all have to be individually considered. Id. A lawsuit may be certified
for class litigation only if it is clear that all elements of plaintiffs' proposed claims can be tried to a
single jury (by both plaintiffs and defendants) using evidence and arguments equally applicable to
every class member. Id. at 435-36. "If it is not determinable from the outset that the individual issues
can be considered in a manageable, time-efficient, yet fair manner, then certification is not
appropriate." Id. at 436.

 Similarly, causation issues in this case will be highly individualized. The combination
of factors to consider is almost limitless. For example, whether the damages the plaintiffs complain
of were caused by the actions of Ford will depend on, among other things: (1) when the vehicle was
sold to the plaintiff; (2) what paint process was used on the vehicle; and (3) what environmental
factors the vehicle was exposed to. The answers to these questions will vary from individual to
individual and will affect a determination of whether causation is present or not. Instead, the trial
court's proposed jury questions ask the jury to decide on an "all-or-nothing" basis whether Ford's sale
of vehicles without spray primer was a producing cause of damages to the many plaintiffs who
purchased these vehicles over a long period of time.

 In considering the causation issue with Ford's allegedly defective paint jobs, the court
in Ford Motor concluded that "the nature of the paint problem and causation would require
individualized discovery, retention of experts, and trials for each plaintiff." In re Ford Motor, 182
F.R.D. at 221. More importantly, Bernal has made it clear that class actions may not diminish any
substantive rights of either party. Bernal, 22 S.W.3d at 437. Specifically, a defendant must be given
the opportunity to contest all the elements of the plaintiffs' claims. Id. at 438.

 In Sanneman v. Chrysler Corp., a similar paint-peeling case, the court determined that
unless it could be shown that ultraviolet rays are the sole cause of the paint peeling, individual
determinations would be necessary. 191 F.R.D. 441, 451 (E.D. Pa. 2000). The court noted that even
if ultraviolet rays are the root cause of the paint peeling, a determination will still be necessary for
each vehicle as to whether any other factors contributed to the peeling. Id. The court went on to
state:


Because the experts do not agree that ultraviolet rays are always the root cause of
delamination, or that they ever are the only cause, proof of damages would most
likely have to be made vehicle by vehicle, assessed according to how much of the
damage is due to these contributing factors. 


. . . .


This type of individualized determination of damages, especially when contemplated
for thousands of potential class members, weighs strongly against certification.



Id.

 In the present case, the plaintiffs' experts agree that ultraviolet rays are not the only
cause of paint peeling. Moreover, the trial court in this case originally acknowledged that because
there were so many potential causes of paint peeling, the case would probably have to have a phase
of individual trials after the resolution of common issues. See Sheldon, 965 S.W.2d at 67-68. 
Finally, the amount of damage attributable to the alleged defect will also have to be individually
determined. "When individual rather than common issues predominate, 'the economy and efficiency
intended by class action treatment are lost and the need for judicial supervision and the risk of
confusion are magnified.'" Sanneman, 191 F.R.D. at 454 (quoting 7A Charles A. Wright & Arthur
R. Miller, Federal Practice and Procedure § 1778 (1986)). 

 We agree with the Sanneman court's conclusion:

[T]he need to establish injury and causation with respect to each class member will
necessarily require a detailed factual inquiry including physical examination of each
vehicle, an [sic] mind-boggling concept that is preclusively costly in both time and
money. We will not certify a class that will result in an administrative process lasting
for untold years, where individual threshold questions will overshadow common
issues regarding Defendant's alleged conduct. Accordingly, we conclude that Plaintiff
has not adequately shown that common issues predominate over individual issues.


Id. at 449. As in Sanneman, establishing causation in this case will necessarily involve a physical
examination of each vehicle to determine what caused its paint to peel. Additionally, it will require
separate discovery of each owner concerning how the owner treated his vehicle and whether other
factors contributed to the peeling. Clearly, individual threshold questions will overshadow common
issues. Therefore, plaintiffs have not shown that common issues will predominate over individual
issues. 


CONCLUSION


 The class-certification record convinces us that common issues do not predominate. 
Jury determinations as to causation, knowledge, and defect will depend heavily on different
information from each individual claimant. As our above discussion makes clear, individual issues
will be the focus of much of the efforts of the litigants and the court; thus an impediment to class
action. Resolving these individual issues for all the class members will be an unmanageable task
for the jury. Additionally, Ford is entitled to challenge the credibility of and its responsibility for
each claim individually. 

 We hold that the trial court's certification order was an abuse of discretion because
questions of law or fact common to the class will not predominate. Because of this conclusion, we
need not consider Ford's other objections to the class action or trial plan. We reverse the order
granting certification and remand this cause back to the trial court for further proceedings consistent
with this opinion.



 

 David Puryear, Justice

Before Justices B. A. Smith, Patterson and Puryear

Reversed and Remanded

Filed: August 14, 2003

1. Generally speaking, this case involves Deceptive Trade Practices Act ("DTPA") and
implied warranty claims brought by the plaintiffs against Ford. See Tex. Bus. & Com. Code Ann.
§§ 2.314;17.41-.63 (West 2003).
2. Three other plaintiffs, Rueter, Porter, and Sanders, no longer wish to serve as class
representatives and are pursuing their claims individually.
3. The new process was adopted for F-Series Trucks, Broncos, Bronco IIs, Rangers, and
Mustangs.
4. Because rule 42 is based on the federal rule of civil procedure governing class actions,
federal court decisions dealing with class actions are persuasive authority. Southwestern Ref. Co. 
v. Bernal, 22 S.W.3d 425, 433 (Tex. 2000). 
5. The facts in In re Ford Motor Co. Vehicle Paint Litigation are almost identical to the facts
in this case. For example, in this case the plaintiffs' paint expert has testified that solid color Ford
vehicles, when painted with proper thickness and proper bake, should not be at risk of peeling due
to UV radiation, even though they have high-build electrocoat and not spray primer. The plaintiffs'
expert's testimony in Ford Motor was identical. In re Ford Motor Co. Vehicle Paint Litig., 182
F.R.D. 214, 220 (E.D. La. 1998). 
6. While the paint process might be tested for defectiveness under one set of defined
circumstances, many of the additional factors discussed above will inevitably be introduced, causing
the analysis to degenerate into confusing "mini-trials" on defect.